# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 1, 2015 Session

## STEPHANIE KELLER ET AL.
### v.
## ESTATE OF EDWARD STEPHEN McREDMOND ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 06-3004-IV     Russell T. Perkins, Chancellor**

_____

**No. M2013-02582-SC-R11-CV – Filed July 11, 2016**
_____

This case involves an internecine conflict among siblings who were shareholders in a closely-held family corporation. The dispute resulted in dissolution of the original family corporation, the formation of two new competing corporations, and a long-running lawsuit in which one group of shareholder siblings asserted claims against the other group of shareholder siblings. After a trial, the trial court awarded damages to the plaintiff shareholder siblings. The Court of Appeals reversed, holding that the plaintiff shareholder siblings did not have standing because their claims were derivative in nature and belonged to their new corporation. We granted permission to appeal to consider the standard for determing whether a shareholder's claim is a direct claim or a derivative claim. In this Opinion, we set aside the approach for determining whether a shareholder claim is direct or derivative described by this Court in Hadden v. City of Gatlinburg, 746 S.W.2d 687, 689 (Tenn. 1988), and adopt in its stead the analytical framework enunciated by the Delaware Supreme Court in Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004). Under the Tooley framework, the analysis of whether a shareholder claim is direct or derivative is based solely on who suffered the alleged harm—the corporation or the suing shareholder individually—and who would receive the benefit of the recovery or other remedy. In light of this holding, we affirm in part and reverse in part the decision of the Court of Appeals, and we remand to the Court of Appeals for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Case Remanded to the Court of Appeals for Further Proceedings**

HOLLY KIRBY, delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and JEFFREY S. BIVINS, JJ., joined.

John P. Branham, C. David Briley and Mandy Strickland Floyd, Nashville, Tennessee, for the appellants, Anita Sheridan, Linda Orsagh, and the Estate of Edward Stephen McRedmond.

Richard K. Smith, Nashville, Tennessee, additional counsel for the appellant, Estate of Edward Stephen McRedmond.

Roger A. Maness, Clarksville, Tennessee, and Jere R. Lee, Nashville, Tennessee, for the appellee, Louis A. McRedmond.

## OPINION

### FACTS AND PROCEEDINGS BELOW

### Background

In 1932, two brothers, Louis McRedmond and Patrick McRedmond, formed a business partnership; perhaps not surprisingly, they called the partnership "McRedmond Brothers." In 1957, the business was incorporated in Tennessee and renamed "McRedmond Brothers, Incorporated" (MBI). MBI's principal place of business was located at 919 Massman Drive in Davidson County, Tennessee. MBI owned and operated a "grease business," that is, the business purchased used grease from restaurants and other suppliers and then filtered, blended, and tested the grease to sell for reuse, primarily to animal feed manufacturers.

Over time, Louis McRedmond's family bought out the Patrick McRedmond family's interest in MBI. As a result, the sole owners of the MBI stock became Louis McRedmond and six of his ten children. Louis McRedmond owned 46% of the MBI stock; his two sons, Louis Anthony McRedmond ("Louie") and Edward Stephen McRedmond ("Stephen"), each owned 23%; and four of his eight daughters, Anita McRedmond Sheridan ("Anita"), Edith Stephanie McRedmond Keller ("Stephanie"),

Theresa McRedmond ("Theresa"), and Ellen McRedmond Kade ("Ellen"), each owned 2%.[1]

In September 1996, Louis McRedmond and his six shareholder children signed an irrevocable Shareholders Agreement. Under the Shareholders Agreement, each of the shareholders agreed that they would vote their shares "in the manner directed jointly by [Louie] and [Stephen]."[2]

Less than a year later, in August 1997, Louis McRedmond died. He bequeathed all of his MBI shares to his ten children in equal amounts. In this way, all ten McRedmond children became shareholders in MBI. After acquiring their father's shares, Louie and Stephen each owned 27.6% of the stock. Altogether, the eight sisters owned the remaining 44.8% of the stock.

Although one of MBI's primary businesses was its grease business, the corporation also had real estate investments. Relevant to this case, MBI acquired about eleven acres of real property formerly used for industrial purposes; the parties refer to this land as the Neuhoff Property. MBI invested substantial funds to develop the Neuhoff Property for commercial use.[3] During the relevant time period, Louie ran the day-to-day operations of MBI's grease business, while Stephen was involved in MBI's management and development of the Neuhoff Property.

In 2006, the seeds of the current litigation were sown. Louie and Stephen began to disagree on a number of MBI issues, in particular, MBI's plan for either developing or disposing of the Neuhoff Property.[4] They also disagreed about who should be on MBI's board of directors.[5] Under the Shareholders Agreement, only Louie and Stephen could

---

[1] As did the Court of Appeals, we refer in this opinion to the McRedmond children by their first names. See In re Estate of McRedmond, No. M2013-02582-COA-R3-CV, 2014 WL 6324283, at *1 n.1 (Tenn. Ct. App. Nov. 14, 2014). This is done for the sake of clarity, and no disrespect is intended.

[2] A lawyer who assisted in drafting the agreement explained that Louis McRedmond "wanted to ensure that his sons . . . would be able to run the company and that their sisters, though having an interest in the company, would not be involved in the actual running of the business." Unfortunately, as will be seen, the wisdom of this decision proved questionable.

[3] Anita invested a substantial amount of her own money into renovating an apartment in one of the Neuhoff Property buildings so that she and her husband could live there.

[4] Louie objected to the investment of additional MBI money in the Neuhoff Property; MBI had already invested over $1 million in the property, and Louie thought that this was a bad investment.

[5] In early 2007, MBI's board consisted of Louie, Stephen, and Anita. At a stockholders meeting held in March 2007, Louie and his plaintiff-sisters—each casting their own votes *pro rata*, in direct contravention of the Shareholders Agreement—voted in Louie, Theresa, and Stephanie as the new board.

vote on such matters, so their inability to agree resulted in deadlock in MBI's management.

To resolve the stalemate, Louie and six of his eight sisters filed a lawsuit to terminate the Shareholders Agreement. In December 2006, Louie and six of the sisters (Stephanie, Theresa, Ellen, Delores McRedmond ("Delores"), Julie McRedmond ("Julie"), and Mary Pauline McRedmond Vogel ("Mary")) (collectively, "Plaintiffs"), filed a complaint for declaratory judgment and other relief in the Chancery Court for Davidson County against Stephen and the remaining two sisters (Anita and Linda McRedmond Orsagh ("Linda")) (collectively, "Defendants"). The Plaintiffs asked the trial court to declare that Louie and Stephen were deadlocked in matters relating to the management of MBI and to terminate the Shareholders Agreement so that all MBI shareholders could vote their shares *pro rata* on matters affecting MBI operations.

In March 2007, MBI filed a separate declaratory judgment action in which the ten shareholders were named as defendants. This complaint sought a judicial declaration of MBI's rights and obligations due to the dispute in the first lawsuit over the control of the company. Among other things, MBI asked the trial court to declare that MBI was "an interested party to the issues raised" in the first lawsuit, in the event the cases were consolidated.

Eventually, the trial court consolidated the two cases. The proceedings, however, were bifurcated, with the trial court considering the validity of the Shareholders Agreement first.

In December 2007, the trial court conducted a trial on the validity of the Shareholders Agreement. In January 2008, it entered an order granting in part the Defendants' motion for involuntary dismissal pursuant to Rule 41.02 of the Tennessee Rules of Civil Procedure. The trial court concluded that the Shareholders Agreement was enforceable and that Louie and Stephen were "deadlocked on the issue of who should be appointed as the third member of the Board of Directors of [MBI]." In light of this ruling, the parties agreed that MBI should be dissolved. All other issues were reserved.

In April 2008, the trial court entered an order that reflected the parties' agreement to immediately begin dissolving MBI due to the brothers' deadlock, subject to further orders of the court. See Tenn. Code Ann. § 48-24-301 (2012). On September 22, 2008, the trial court entered an agreed order appointing Samuel K. Crocker as receiver for MBI. Mr. Crocker was to immediately take control of MBI's assets and records and its business, "with the understanding that [MBI] shall continue to conduct its ordinary course of operations, subject to oversight by the Receiver." Mr. Crocker was directed to ensure that MBI's grease business was operated in a manner that would "protect its

value." The trial court enjoined "all Parties and those acting in concert with them" from taking certain actions:

> Except as expressly provided above, or as authorized by the Receiver, all Parties and those acting in concert with them are hereby enjoined from taking any actions as to the business or assets of [MBI], including, without limitation, entering into any contract or obligation on behalf of [MBI], taking possession of any asset of [MBI], or expending any funds of [MBI]. Further, upon direction of the Receiver, all Parties and those acting in concert with them are hereby enjoined immediately to deliver or make available to the Receiver any asset of [MBI] in their possession, custody or control; and are subject to sanctions by this Court for failure to so do.

The trial court directed Mr. Crocker to propose a plan for dissolving MBI.

In January 2009, the trial court entered an "Initial Report of Receiver and Agreed Order." In his report, Mr. Crocker concluded that both the grease business and the Neuhoff Property would be worth more to "certain of the Parties than they would be to anyone else," so his proposed dissolution plan gave the parties an opportunity to purchase MBI's assets. The plan divided MBI's assets into two groups: (1) the grease business assets and (2) the Neuhoff Property/other real estate assets.[6] These assets were to be sold to the highest bidder "'as is, where is' with no guarantees and/or warranties of any sort whatsoever." After resolution of the creditors' claims, the receiver would distribute the sale proceeds to the ten MBI shareholders *pro rata*. The dissolution plan was attached to and incorporated into the trial court's order.

In February 2009, Louie submitted a bid for the grease business assets in the amount of $360,000 plus the cash-on-hand.[7] Louie did not bid on the real estate assets. The next day, Stephen, Anita, and Linda submitted a joint bid of $758,000 for the grease business assets plus $358,000 for the Neuhoff Property and other real estate assets, for a total bid of $1,116,000. Louie made no attempt to outbid Stephen, Anita, and Linda. The next month, Mr. Crocker notified Stephen, Anita, and Linda (collectively, the "Buyers") that they were the successful bidders.

---

[6] The sale of the Neuhoff Property/other real estate assets is not at issue in this appeal.

[7] The amount of the cash-on-hand fluctuated, and the record does not indicate the amount of cash-on-hand when Louie made his bid or the average amount that MBI kept in cash. Louie indicated in discovery responses, however, that the cash-on-hand the day before the closing, after much of the inventory was liquidated was $87,554.68.

On March 25, 2009, Mr. Crocker and the Buyers executed an Asset Purchase Agreement in which Mr. Crocker agreed to sell the MBI grease business assets and the Neuhoff Property and other real estate assets "to Buyers or their Designee(s)." The assets to be sold to the Buyers included "the names and any derivations of the names of the business entities which currently own and operate the Businesses [and] the goodwill associated with the foregoing." Mr. Crocker intended to sell the business as a "going concern" and anticipated that the Buyers would continue to operate the grease business as it had operated before.

On April 1, 2009, the trial court entered an order approving Mr. Crocker's sale of the assets; the Asset Purchase Agreement was attached to the order. Pending the sale, the order imposed on "the current officers and directors of the Grease Business Assets," which included both Louie and Stephen, the following requirements:

> 1. Conduct the Business only in the usual, regular and ordinary course, preserve the organizational structure of the Business, and preserve intact for the Buyer the goodwill of the Business and the present relationship between the Business and the employees, suppliers, clients, customers and others having business relations with the Seller;
> ….
> 4. Take all action and . . . do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by the agreement of the Buyer to purchase the Business . . . .

Thus, the purchase agreement anticipated the sale of MBI's physical assets in the context of a going concern, and the trial court's order required the parties to operate it as such, to preserve its business relationships and its goodwill. The closing date was set for a week later, April 8, 2009.

Prior to the closing, the Buyers paid the $1,116,000 purchase price to their counsel to hold in a trust account until the closing. The Buyers also formed and capitalized a new corporation, called McRedmond Feed Company, Incorporated ("McRedmond Feed"), to be their "designee" to accept the grease business assets at the closing.

On the date of the closing, April 8, 2009, the Buyers executed a document entitled "Designation," which stated in relevant part:

> The undersigned, as the Buyers under that certain Asset Purchase Agreement dated March 25, 2009 ("Agreement"), between the Buyers and Samuel K. Crocker, Receiver, as seller, hereby assign the right to and

designate the following entities to purchase the assets described in the Agreement:

….

McRedmond Feed Company, Inc., a Tennessee corporation, is named the Buyers' designee for purposes of purchasing the assets identified in the Agreement as the Grease Business.

This Designation is executed and effective on April 08, 2009.

Also at the closing, Mr. Crocker executed a bill of assignment that stated:

THIS BILL OF SALE AND ASSIGNMENT ("Bill of Sale") is executed as of April 8th, 2009, by Samuel K. Crocker, Receiver for McRedmond Brothers, Incorporated, by Order of the Chancery Court of Davidson County . . . pursuant to the Asset Purchase Agreement . . . among the Assignor, and [the Buyers] or their designee (the "*Purchasers*"), and is subject to all of the terms and conditions thereof. The Purchasers have assigned all of their rights and responsibilities under the Agreement with regard to the purchase of the Grease Business Assets to McRedmond Feed Company, Inc., a Tennessee corporation (the "*Assignee*"). . . .

The bill of assignment attached an "Acknowledgement of Receipt of Transferred Assets," signed by Stephen on behalf of McRedmond Feed. It stated: "Assignee [McRedmond Feed] hereby acknowledges receipt of the above described assets, all as of this date." The Buyers, through counsel, gave Mr. Crocker a $1,116,000 check written on the trust account of counsel for the Buyers. In this way, the Buyers personally capitalized the MBI grease business and simultaneously assigned their rights and responsibilities under the Asset Purchase Agreement to their designee, McRedmond Feed. Soon after the closing, the dissolved MBI changed its corporate name from "McRedmond Brothers, Inc." to "McRedmond Dissolution Corporation" so that the newly formed McRedmond Feed could change its name to "McRedmond Brothers, Inc.," and do business under that name.[8] On the afternoon of the closing, Louie sent notice to Mr. Crocker of his resignation as an employee, officer, and director of the original MBI.

---

[8] Tennessee law does not allow two corporations to have the same name. See Tenn. Code Ann. § 48-54-101(b) (2012).

- 7 -

Shortly after the closing, the Buyers received a rude surprise. Unbeknownst to the Buyers, during the preparations to sell MBI's assets, Louie had been preparing to open his own competing grease business. On March 5, 2009, Louie (or someone on his behalf) filed a charter of incorporation for Louie's new business, L. A. McRedmond, Incorporated ("LAMI"). On March 24, 2009, Louie opened a bank account for LAMI. Also in March, Louie began buying equipment for LAMI; he had it delivered to himself at the MBI grease plant on Massman Drive. He reportedly discussed his plans for the new business with at least two MBI employees and asked them to come work for his new company after the sale. Prior to the closing, Louie allegedly solicited the business of MBI's best customer, Tyson Foods.[9] During his last few days working for MBI, Louie stopped ordering loads of grease for MBI, so that MBI's grease inventory was almost completely depleted by the date of the closing. Instead, Louie ordered loads of grease for his new company, LAMI. By April 9, 2009, the day after the sale, LAMI was fully operational as a competing grease business; it received its first shipment of grease for resale on that day.[10] LAMI then admittedly targeted the same vendors who sold grease to MBI and customers who bought grease from MBI, using the same grease plant historically used by MBI and operating out of MBI's office on Massman Drive. As if to put an exclamation point on it, LAMI even parked its newly purchased semi-trailers at the docks customarily used by MBI.

Anita would later testify that Louie's actions, particularly the depletion of MBI's grease inventory, left their new company paralyzed because it was without inventory to fill grease orders. She claimed that just replenishing the grease inventory back to normal levels took between a month and six weeks.

On April 23, 2009, in the ongoing lawsuit in chancery court, the Buyers filed a motion for a temporary injunction pursuant to Rule 65.04 of the Tennessee Rules of Civil Procedure. The Buyers asked the trial court to enjoin Louie from operating a competing business "on or about" the grease plant facility and to require the competing business to vacate MBI's facility. They also sought an order prohibiting Louie from telling customers and vendors that MBI was no longer in operation, from contacting MBI employees, and from otherwise interfering with the operations of McRedmond Feed/new MBI. The Buyers did not specifically name LAMI in the lawsuit, but they sought relief against Louie and any other plaintiff "acting in concert therewith in the operation of a competing business that is the subject of this Motion."

---

[9] Some evidence showed that 60% to 70% of MBI's sales were to Tyson Foods.

[10] When Louie received a second load for his new business on or around April 9, he claims that he let McRedmond Feed have it, because the new owners were not pleased at having been left with virtually no inventory.

In opposition to the motion for injunctive relief, Louie claimed that the Buyers could not show that their rights were being violated or that his actions were causing irreparable harm within the meaning of Rule 65.04.[11] Louie asserted that the Buyers had no right to have him removed from the subject property and that he had a right to operate his business there because he still owned the land as a tenant in common with others. Both parties filed affidavits to support their positions.

In May 2009, after a non-evidentiary hearing, the trial court entered an order granting the Buyers' motion for a temporary injunction. The order enjoined Louie "and any entity or individual that he controls, or any entity or any individual that is cooperating with him" from operating a grease business at the grease plant facility on Massman Drive and from interfering in any way with the operations of the new MBI on the premises. The injunction also prohibited Louie from parking his trailers or tractors on the north end of the property but permitted him to park the vehicles on the south end. The trial court explained, "The purpose of this Order is to preserve the status quo as it existed on April 8, 2009, and give the [Buyers] the benefit of their bargain." It added, however, that the order was not intended to prevent Louie from operating a grease business at some other site.

In July 2009, the Buyers were granted leave to amend their answer to the original complaint to include a counterclaim against Louie and any other named plaintiff who may have been acting in concert with him.[12] The Buyers first pointed out that the trial court's April 1, 2009 order required Louie to "[c]onduct the Business only in the usual, regular and ordinary course, preserve the organizational structure of the Business, and preserve intact for the Buyer[s] the goodwill of the Business and the present relationship between the Business and the employees, suppliers, clients, customers and others having business relations with the Seller." They asserted: "Both before and after the Court's April 1 Order, and in direct contravention of this Order, [Louie] (and such other of the above-named Plaintiff/Counter-Defendants working in concert with him) have, with improper motives and means, intentionally and maliciously interfered with [the Buyers'] rights, intentionally and maliciously interfered with [the Buyers'] relationships, breached their (Plaintiffs') duties as fiduciaries to [MBI], and have otherwise caused irreparable

---

[11] Subsection (2) of Rule 65.04 provides that a temporary injunction may be issued if it is clearly shown "that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action." Tenn. R. Civ. P. 65.04(2).

[12] Although Stephen filed an amended answer and counterclaim separately from Anita and Linda, all of the counterclaims are substantively identical and will be treated as one motion for purposes of discussion.

damage to [the Buyers]."[13]   The Buyers claimed that they were damaged by Louie's intentional and malicious acts, including but not limited to:

a.  Setting up and operating a competing business, [LAMI], on <u>the same property</u> where [new MBI] operates the Grease Business;

b.  Attempting to lure [MBI's] employees to [LAMI] and directing [MBI] employees to perform work for the benefit of [LAMI];

c.  Commandeering the use of [MBI's] loading/unloading docks, and blocking [MBI's] trailers;

d.  Damaging the relationship between [MBI] and its suppliers and customers;

e.  Otherwise operating [LAMI] in a manner calculated to inhibit, impair, annoy, and interfere with [MBI]; and

f.  Misuse of corporate assets in breach of [Louie's] fiduciary duties.

In the wake of these actions, the Buyers asserted, they found themselves "in the position of having purchased a business' assets for over $1.1 million, the proceeds of which are now in the hands of the Receiver, which will distribute the same to the Shareholders of [the original MBI] once its corporate affairs are concluded." They pointed out that, after sabotaging the going concern purchased by the Buyers, Louie and his cohorts likely fully expected "to receive their respective shares when the proceeds of the sale are released by the Receiver." The Buyers asked the trial court to permanently enjoin Louie and his allies and award them both compensatory and punitive damages. The counterclaim did not include either McRedmond Feed or the new MBI as a plaintiff, and did not name either LAMI or the original MBI as a defendant.

In January 2011, the trial court entered an order setting the case for trial on April 4, 2011. Discovery ensued.

On March 28, 2011, a week before the scheduled trial, Stephen died. As a result, the case was continued. Louie filed a suggestion of death, and Stephen's estate was

---

[13] The quotations to the counterclaim are taken from the joint counterclaim of Anita and Linda. Stephen's counterclaim was not identical, but it was substantively similar to the counterclaim filed by Anita and Linda.

substituted as Defendant/Counter-Plaintiff. The case was later set for trial in December 2011.

In their pre-trial briefs, Louie and his six counter-defendant sisters argued, for the first time, that the counterclaim was fatally flawed because neither McRedmond Feed nor the new MBI was named as a counter-plaintiff, and neither LAMI nor the old MBI was named as a defendant. Louie and his sisters asserted that the primary injury about which the Buyers complained was lost profits after the April 8, 2009 closing, and that those profits belonged to the corporation, not the individuals.

In December 2011, the trial court conducted a three-day bench trial on the counterclaim.[14] At the outset, the Buyers announced that they were abandoning their counterclaim as against five of the six sisters, leaving only Louie and Stephanie as counter-defendants. Much of the evidence at trial consisted of deposition transcripts and documents admitted into evidence without challenge. The trial court heard testimony from Louie and sisters Anita and Linda, the receiver Mr. Crocker, and an accountant who compared the sales and profits of the original MBI with that of the new MBI to establish the damages resulting from Louie's actions.[15]

At the close of the Buyer's proof, Louie and Stephanie made an oral motion for involuntary dismissal of the counterclaim pursuant to Rule 41 of the Tennessee Rules of Civil Procedure. Consistent with their pre-trial brief, they argued that the case should be dismissed because the proper parties were not before the court, and that if any party suffered damages in the case, it was the new MBI, not the individual counter-plaintiffs. In response, the Buyers argued that they used a corporate entity merely as a "vehicle" by which to acquire MBI's assets, and their use of such a "vehicle" did not affect the nature of the sale to the individual counter-plaintiffs. They contended that Louie and Stephanie had waived any failure to include indispensable parties because they did not raise it as an affirmative defense. The Buyers claimed that they as individuals suffered damages from the actions of Louie and Stephanie because they did not get what they bargained for in the purchase of the grease business assets. The trial court reserved its ruling on the

---

[14] Until the trial, counsel for the original MBI had participated in the proceedings on behalf of MBI. At the beginning of the trial, however, counsel announced that the corporation was then a "defunct" corporation and was neutral as to the result of the trial. Without objection from the parties, the case proceeded without further participation by counsel for the original MBI.

[15] The accountant testified that, in 2007, the original MBI had $224,397 in taxable income, about $7.2 million in gross sales, and about $1.4 million in gross profits. In 2008, the original MBI had $123,943 in taxable income, about $6.5 million in gross sales, and $1.3 million in gross profits. In 2009, after the sale, the new MBI suffered a $318,776 net loss, had about $2.1 million in gross sales, and $236,000 in gross profits. In 2010, the new MBI suffered $326,326 loss, $4.8 million in gross sales, and $569,000 in gross profits.

motion for involuntary dismissal, heard the proof from the counter-defendants, and then took the matter under advisement.

On July 3, 2013, the trial court entered a written order holding in favor of the Buyers against Louie, but not against Stephanie.[16] The order first identified the relief requested by the Buyers:

> The Buyers here are seeking six things: 1) a permanent injunction preventing [LAMI] from operating a grease business from the Massman Drive property and affording related relief; 2) a declaration that [Louie and Stephanie] violated the Orders of the Court, including the Order of April 1, 2009; 3) a judgment on the claim that [Louie, Stephanie, and LAMI] intentionally interfered with the Buyers' business relationship; 4) judgment against [Louie] for breaching his fiduciary duty to McRedmond Brothers, Inc.; 5) a judgment for punitive damages against [Louie and Stephanie]; and 6) a judgment declaring that three of the sisters ([Delores, Julie, and Mary]) waived their right to become shareholders of [the original MBI].

The order then explained the trial court's reasons for granting some, but not all, of the relief requested by the Buyers. The trial court first made factual findings that Louie intentionally took steps to deplete the inventory of the grease business prior to the sale and to set up a competing business on the existing premises on Massman Drive. This conduct, the trial court held, violated the court's September 22, 2008 and April 1, 2009 orders directing MBI employees, officers, and directors, including Louie, to preserve the goodwill of the company and its relationship with employees, suppliers, clients, customers, and others having a relationship with the grease business. The trial court further held that Louie's conduct "violated his fiduciary duty to exercise the highest degree of loyalty to McRedmond Brothers, Inc." Louie's solicitation of MBI's largest customer, Tyson Foods, was also deemed to violate his fiduciary duty to McRedmond Brothers, Inc. Louie's recruitment of valuable employees away from the original MBI, the trial court held, violated his fiduciary duty and his duty to follow the court's orders, and demonstrated that his actions were intentional. The trial court held, "Obviously, the Buyers have sustained actual damages from this intentional conduct that operated to circumvent the Orders of the Court and the joint liquidation process agreed upon by the parties."

---

[16] It appears from the appellate record that the trial court's ruling in the case was delayed by ongoing proceedings involving intervenors who made a claim to the proceeds of the sale. Those proceedings are not relevant to the issues in this appeal.

The trial court next held that the conduct of both Louie and Stephanie amounted to intentional interference with business relations. It found that Louie "knew of the sale of the impending grease business and intentionally interfered with this business prospect by the improper conduct outlined above, including the breach of fiduciary duty to McRedmond Brothers, Inc., his obligation to abide by the orders of the Court, and the implied covenant of good faith and fair dealing implicit in every contract."

As to Stephanie, the trial court found that she participated in the alleged condut to some degree "due to her loyalty to her brother" but, unlike Louie, she had no fiduciary duty to the original MBI, so she was "not liable under the theories asserted against her."[17] The order noted that the Buyers had indirectly asserted a claim of civil conspiracy but held that it was not sufficiently alleged or proven.

In a footnote, the trial court's order rejected Louie's argument that the Buyers were required to add McRedmond Feed and/or the new MBI as counter-plaintiffs. It found this claim to be "without merit" because "[t]he Buyers were damaged when they, as individuals, paid $758,000.00 for the grease business on April 8, 2009."

Regarding damages, the trial court reasoned that "[d]amages for violating the Orders of the Court, particularly Agreed Orders, implicate contract law damages," which are "designed to place the plaintiff, as nearly as possible, in the same position he or she would have been in had the contract been fully performed and had there been no breach." In this case, the trial court held, "the Buyers did not receive what they bargained for in purchasing the 'going concern' assets of the grease business for $758,000.00," and so they were entitled to "benefit of the bargain" damages. Given Louie's conduct prior to the sale, the trial court held that "the Buyers received approximately half of what they bargained for, something that was much closer in value to [Louie's] bid of $360,000." Based on this, the trial court awarded the Buyers damages in the aggregate amount of $375,000, to be divided equally between the three counter-plaintiffs unless they agreed on a different apportionment. For purposes of the damage award, the trial court merged the damages from all the theories of recovery, namely, Louie's violation of the court's orders, intentional interference with business relations, and breach of fiduciary duty.

In addition, the trial court made its May 2009 temporary injunction permanent in all respects. It then formally dismissed the claims against all six of the sister counter-defendants. The trial court rejected the Buyers' claim for punitive damages because, although Louie's conduct was intentional, he engaged in that course of conduct "under a colorable claim of right." Because the July 2013 order did not resolve all of the claims

---

[17] The trial court's ruling in favor of Stephanie is not at issue in this appeal.

asserted and was not a final order, the trial court certified it as final and appealable pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. Louie then appealed.

The Court of Appeals reversed the decision of the trial court in its entirety. See In re Estate of McRedmond, No. M2013-02582-COA-R3-CV, 2014 WL 6324283 (Tenn. Ct. App. Nov. 14, 2014). The appellate court's decision was based on its conclusion that the Buyers did not have standing to assert the claims against the counter-defendants because any alleged injury was suffered by the new corporation McRedmond Feed,[18] not by the Buyers individually. Id. at *17-19.

The Court of Appeals began its analysis by recognizing that, "[u]nder Tennessee corporation law, a corporation and its shareholders are distinct entities." Id. at *14 (quoting Cambio Health Solutions, LLC v. Reardon, 213 S.W.3d 785, 790 (Tenn. 2006) (citing Hadden v. City of Gatlinburg, 746 S.W.2d 687, 689 (Tenn. 1988); Gen. Tel. Co. v. Boyd, 343 S.W.2d 872, 875 (Tenn. 1960))). Quoting Hadden, the appellate court held that "[s]tockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer." Id. at *15. Applying that standard, the Court of Appeals held that the Buyers could not recover benefit of their bargain damages because they were not the ultimate purchasers of the grease business assets—the corporation was the actual purchaser, so it suffered any injury caused by Louie's wrongdoing. Id. at *17. The appellate court reasoned:

> From our review of the record, we conclude that the damages of which the counter-plaintiffs complain were sustained by the corporations involved in this case, not by Anita, Linda, or Stephen individually. We cannot discern an individual injury "done directly to" Anita, Linda, and Stephen in their own right because they have never, individually, owned or operated the grease business. The alleged injury resulting from Louis's alleged violation of court orders governing the conduct of MBI employees pending the sale was to the ultimate buyer of the grease business assets. Similarly, the party who was injured by the alleged interference with business relations, if Louis knew of the sale of the grease business and "intentionally interfered with this business prospect," was, again, the buyer of the assets.

Id. at *18. The appellate court disagreed with the Buyers' contention that they were damaged because their funds were used to pay for the grease business assets:

---

[18] McRedmond Feed is sometimes referred to as the "new MBI." In our discussion on standing, we refer to the new corporation formed by the Buyers simply as McRedmond Feed.

- 14 -

[W]e do not find the issue of payment controlling. Regardless of who provided the funds that enabled McRedmond Feed Company, Inc. to purchase the assets, the fact remains that McRedmond Feed Company, Inc. purchased the assets. The three individuals assigned their right to purchase the assets and assigned all of their rights and responsibilities under the asset purchase agreement to McRedmond Feed Company, Inc. As a result, McRedmond Feed Company, Inc. received or did not receive the "benefit of the bargain," not Stephen, Anita, or Linda. The trial court found that "the Buyers did not receive what they bargained for in purchasing the 'going concern' assets" (emphasis added), but the three individuals were not the buyers. A distinct corporate entity is and always has been the owner and operator of the grease business. Even though, as in <u>Hadden</u>, the injury sustained by the corporation "directly affected" the individuals, "as a practical matter," "this fact does not entitle [the shareholders] to bring a cause of action to recover damages sustained by the corporation." [<u>Hadden</u>,] 746 S.W.2d at 690.

<u>Id.</u>

The Court of Appeals further held that none of the Buyers had standing to assert that Louie breached his fiduciary duty to the original MBI, because a breach of fiduciary duty to the corporation generally injures only the corporation, so it must be asserted in a derivative action brought on behalf of the corporation. <u>Id.</u> at *19.

The appellate court also rejected the Buyers' assertion that they were entitled to sue on their own behalf because the wrongful acts occurred before the new corporation was formed. It held that McRedmond Feed was the actual buyer of the original MBI's assets, and any decrease in value suffered by Louie's wrongful acts was suffered by the corporation only. <u>Id.</u> For the same reasons, the appellate court held that the Buyers did not have standing to seek a permanent injunction to prevent Louie from operating his grease business on the Massman Drive property to give them the "benefit of their bargain." <u>Id.</u> Because the Buyers' individual rights were not violated, and the Buyers would not suffer irreparable harm from Louie's conduct, the Buyers lacked standing to seek an injunction against Louie.[19] <u>Id.</u> at *20.

---

[19] The Court of Appeals also rejected the Buyers' claims that Louie waived any "standing" defense based on the fact that he first raised the issue in his pre-trial brief. <u>Id.</u> at *21. The court determined that, because standing is not an affirmative defense which must be properly pled, Louie did not waive his right to complain about the Buyers' lack of standing.

Thus, the Court of Appeals reversed the trial court's decision, dismissed the counterclaim, and vacated the permanent injunction issued by the trial court. We granted the Buyers' application for permission to appeal.

## ISSUES ON APPEAL

In their appellate brief, the Buyers list several issues for review: (1) whether the evidence supports the trial court's findings of fact and conclusions of law, (2) whether the Buyers had standing to bring their counterclaim, (3) whether the trial court properly found that the Buyers suffered injury sufficient to confer standing, (4) whether the trial court properly held that the Buyers could bring a direct suit for breach of fiduciary duty, and (5) whether the remaining issues raised by Louie in the Court of Appeals lack merit. In Louie's appellate brief, he responds to the issues raised by the Buyers and also reasserts the issues he raised in the Court of Appeals that were not addressed by that court.

In the context of analyzing the issues raised by the parties on appeal, we will focus on the standard in Tennessee for determining whether a claim brought by shareholders of a corporation is derivative or direct in nature.

## ANALYSIS

"Corporations are creatures of state law." Cort v. Ash, 422 U.S. 66, 84 (1975). "The Federal Constitution does not confer upon either domestic or foreign corporations the right to engage in intrastate commerce" in any given state. Louis K. Liggett Co. v. Lee, 288 U.S. 517, 544 (1933) (Brandeis, J., dissenting in part). "The privilege of engaging in such commerce in corporate form is one which the state may confer or may withhold as it sees fit." Id. Thus, state law typically controls issues related to corporations, and any federal legislation affecting corporations "is generally enacted against the background of existing state law." Burks v. Lasker, 441 U.S. 471, 478 (1979). While many issues regarding corporations are governed by state statute, some issues are instead decided by the state courts. *See generally* 12B Fletcher Cyc. Corp. § 5911.

"It is generally accepted that the corporation is an entity distinct from its shareholders with rights and liabilities not the same as theirs individually and severally. The corporation and its directors and officers are similarly not the same personality." 12B Fletcher Cyc. Corp. § 5911. (footnotes omitted); see Cambio Health Solutions, 213 S.W.3d at 790 (Tenn. 2006) ("Under Tennessee corporation law, a corporation and its shareholders are distinct entities."). As its own legal entity, a corporation can act only through its officers and agents. It can sue and be sued, take and hold property, and

contract in its own name. 1 Fletcher Cyc. Corp. § 5 (updated through Sept. 2015); see Tenn. Code Ann. § 48-13-102(1) (2012) ("[E]very corporation . . . has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs," including the power to "[s]ue and be sued, complain and defend in its corporate name."). "The legal fiction of a separate corporate entity was designed to serve convenience and justice." 1 Fletcher Cyc. Corp. § 25 (footnote omitted). This principle informs our analysis of the Court of Appeals' holding that the Buyers, as shareholders, did not have standing to maintain this lawsuit.

The question of standing presented in this case does not involve the typical inquiry into whether the plaintiffs suffered a "distinct and palpable" injury. See Am. Civ. Liberties Union of Tenn. v. Darnell, 195 S.W.3d 612, 620 (Tenn. 2006). Rather, the issue presented is whether the Buyers have "shareholder standing," that is, whether they have standing to bring a direct claim for their injuries as shareholders or whether their claims are derivative in nature and must be brought on behalf of the corporation.[20] See Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990) (defining and discussing the shareholder standing rule); see also Elizabeth Retail Props. LLC v. KeyBank Nat'l Assoc., 83 F. Supp. 3d 972, 986 (D. Or. 2015). To address this issue, we will review some relevant principles of corporation law.

**Derivative Lawsuits**

In most instances, "the proper party to bring a claim on behalf of a corporation is the corporation itself acting through its directors or a majority of its shareholders." House v. Estate of Edmondson, 245 S.W.3d 372, 381 (Tenn. 2008) (quoting Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 531-32 (1984)). Generally, a shareholder has no individual right of action against third persons "for a wrong or injury to the corporation . . . since the wrong thus suffered by the stockholder is merely incidental to the wrong suffered by the corporation and affects all stockholders alike." H. A. Wood, Annotation, Stockholder's Right to Maintain (Personal) Action Against Third Person as Affected by Corporation's Right of Action for the Same Wrong, 167 A.L.R. 279 (20th ed., originally published in 1947).

---

[20] At this stage in the analysis, we need not address whether the evidence supports the trial court's factual findings that Louie engaged in wrongful conduct. Rather, we focus on whether the allegations in the Buyers' counterclaim show that they have standing to recover on their claims. When we address standing "based solely on the pleadings, we must accept 'the allegations of fact as true[, h]owever, inferences to be drawn from the facts or legal conclusions set forth in the complaint are not required to be taken as true.'" Massengale v. City of E. Ridge, 399 S.W.3d 118, 124 (Tenn. 2012) (quoting National Gas Distribs. v. Sevier Cnty. Util. Dist., 7 S.W.3d 41, 43 (Tenn. Ct. App. 1999)).

In some situations, however, a corporation, acting through its directors or a majority of its shareholders, may make the decision not to pursue the corporation's legal rights. Id. At such times, one or more shareholders may decide to bring a derivative action on behalf of the corporation.[21] Id.; see House, 245 S.W.3d at 381-82 ("A derivative action is a suit brought by one or more shareholders on behalf of a corporation to redress an injury sustained by, or to enforce a duty owed to, the corporation."); see also Wallace v. Lincoln Sav. Bank, 15 S.W. 448, 449-50 (Tenn. 1891). A shareholders' derivative action seeks redress for a wrong to the corporation, and the right of the shareholder to maintain the action is derivative or secondary. 12B Fletcher Cyc. Corp. § 5908. For that reason, the corporation is an indispensable party to the action, and the shareholder is a nominal party with no right, title or interest in the claim. Id. Derivative actions have been described as "an extraordinary, equitable remedy available to shareholders when a corporate cause of action is, for some reason, not pursued by the corporation itself." Lewis ex rel. Citizens Sav. Bank & Trust v. Boyd, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992). Technically, "any action in which a shareholder asserts the rights of a corporation could be characterized as 'derivative.'" Fox, 464 U.S. at 527. Any recovery from a derivative suit becomes an asset of the corporation; it benefits the shareholders by increasing the value of corporation and consequently the value of the corporation's stock.[22] Bayberry Assocs. v. Jones, 783 S.W.2d 553, 559 (Tenn. 1990) (quoting Waller v. Waller, 49 A.2d 449, 452 (Md. 1946)); Elizabeth J. Thompson, Note, Direct Harm, Special Injury, or Duty Owed: Which Test Allows for the Most Shareholder Success in Direct Shareholder Litigation?, 35 J. Corp. L. 215, 218 (Fall 2009).

"Through the use of derivative litigation[,] shareholders have the ability to assert claims against directors, management, other shareholders, or even third persons." Thompson, 35 J. Corp. L. at 218. Most often, shareholders file derivative suits "against 'corporate insiders' such as officers, directors, and large shareholders" rather than against parties not involved in the corporation. Id.

---

[21] Threshold preconditions are imposed on derivative suits. See Tenn. Code Ann. § 48-17-401 (2012). These include, for example, the so-called "demand requirement." To comply with this precondition, a stockholder who is contemplating filing a shareholders' derivative lawsuit must first make a written demand on the corporation that it take corrective action or prosecute the suit, unless such a written demand would be futile. See Lewis ex rel. Citizens Sav. Bank & Trust v. Boyd, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992) (quoting Tenn. Code Ann. § 48-17-401(b) (1988)).

[22] Under early common law, a stockholder was permitted to sue on behalf of the corporation only when "the corporation is disabled from suing, as where the managing agents of the corporation (its officers and directors) are themselves to be the defendants, or where the corporation wrongfully and willfully refuses to sue." Wallace v. Lincoln Sav. Bank, 15 S.W. 448, 449 (Tenn. 1891). Even then, any recovery was deemed "for the benefit of the corporation, all its creditors and shareholders, innocent and guilty, sharing proportionately in the benefit of the decree." Id.

## Direct Lawsuits

In contrast to a derivative action, a shareholder who has an individual or primary claim may file a direct lawsuit on behalf of himself or, in the case of a class action, on behalf of all shareholders similarly situated. The plaintiff shareholder in a direct action is not a nominal party, and any recovery belongs directly to the shareholder. 12B Fletcher Cyc. Corp. § 5908. A direct lawsuit is permitted even if "the corporation also may have a cause of action growing out of the same wrong." Wood, 167 A.L.R. at III.a. "The purpose of a direct shareholder suit is to compensate a shareholder for suffering a harm that the corporation itself has not suffered." Thompson, 35 J. Corp. L. at 219. The Delaware Supreme Court has summarized the difference between a derivative lawsuit and a direct lawsuit:

> The derivative suit has been generally described as "one of the most interesting and ingenious of accountability mechanisms for large formal organizations." It enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation. Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation. A stockholder who is directly injured, however, does retain the right to bring an individual action for injuries affecting his or her legal rights as a stockholder. Such a claim is distinct from an injury caused to the corporation alone. In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation.

Tooley, 845 A.2d at 1036 (footnotes omitted).

Generally, "[i]f the injury is one to the plaintiff as a shareholder as an individual, and not to the corporation, . . . it is an individual[, i.e., direct] action." 12B Fletcher Cyc. Corp. § 5911. Examples of direct actions by shareholders include lawsuits against the corporation or its officers or directors alleging that the shareholder was deprived of his voting rights or his right to inspect corporate books, that the shareholder was wrongfully induced into selling his stock, or that he was directly victimized by fraud. In such circumstances, "the shareholder is injured directly and independently of any injury to the corporation" itself. Thompson, 35 J. Corp. L. at 219-20; see also Cato v. Mid-Am. Distrib. Ctrs., Inc., No. 02A01-9406-CH-00149, 1996 WL 502500, at *5 (Tenn. Ct. App. Sept. 6, 1996); Deborah A. DeMott et al., Shareholder Deriv. Actions L. & Prac. § 2:4 (2015-16); see also 12B Fletcher Cyc. Corp. § 5911. On the other hand, a claim based on directors' or officers' breach of fiduciary duty to the corporation through mismanagement of the corporation, waste of corporate assets, or self-dealing is usually considered derivative in nature, because any harm resulting from the wrongful conduct was to the

corporation. Thompson, 35 J. Corp. L. at 218; <u>see</u> DeMott et al., Shareholder Deriv. Actions L. & Prac § 2:4.

While the distinction between a shareholders' derivative action and a shareholder's direct action is not hard to state in general terms, "[c]loser questions are raised by injuries affecting shareholders separately that mirror or overlap the injuries suffered by the corporation." DeMott et al., Shareholder Deriv. Actions L. & Prac § 2:4; <u>see</u> 12B Fletcher Cyc. Corp. § 5911 (noting that "there are border-line cases that may be hard to classify"). We discuss below the analysis on whether a given claim is derivative or direct in nature.

## Derivative Versus Direct

The threshold determination of whether a lawsuit filed by a shareholder is derivative or direct "is sometimes difficult and has many legal consequences, some of which may have an expensive impact on the parties to the action." <u>Tooley</u>, 845 A.2d at 1036. "The most fundamental consequence for a plaintiff who mischaracterizes a derivative cause of action as direct is the risk of dismissal of the claim. A derivative claim belongs to the entity, and an owner has no standing to bring the claim except on behalf of the entity." Daniel S. Kleinberger, <u>Direct Versus Derivative and the Law of Limited Liability Companies</u>, 58 Baylor L. Rev. 63, 71 (Winter 2006) (footnotes omitted); <u>see</u> <u>In re Sagent Tech., Inc., Derivative Litigation</u>, 278 F. Supp. 2d 1079, 1085 (N.D. Cal. 2003) ("A shareholder does not have standing to sue in an individual capacity for injury to the corporation.").

The criteria used to make that determination "depend heavily on state law," specifically, the state of incorporation. John A. Gebauer, Annotation, *Action in Own Name by Shareholder of Closely Held Corporation*, 10 A.L.R.6th 293 at § 3 (2006); <u>see</u> <u>Casden v. Burns</u>, 306 Fed. App'x. 966, 974 (6th Cir. 2009); Thompson, 35 J. Corp. L. at 220. The question of whether a particular claim is derivative or direct is not addressed by the revised Model Corporation Act or by state statutes governing corporations, so the question must be answered by the state courts.

"No comprehensive rule to distinguish direct actions from those that must be maintained derivatively has been formulated by courts making these determinations." DeMott et al., Shareholder Deriv. Actions L. & Prac. § 2:3. However, generally speaking, three methods have emerged from decisions in which courts have grappled with whether a shareholder's claim is direct or derivative. They are referred to as the "direct harm" approach, the "special injury" approach, and the "duty owed" approach.

### *Direct Harm*

- 20 -

The first method for determining whether a shareholder's claim should be classified as direct or derivative is called the "direct harm" approach. Under this approach, the court asks "whether the harm from the alleged wrongdoing flows first to the company and only damages the shareholders or members due to the loss in value of their respective ownership interest in the company, or whether [conversely] the harm flows 'directly' to the shareholder or member in a way that is not secondary to the company's loss." Dinuro Invs., LLC v. Camacho, 141 So. 3d 731, 735 (Fla. Dist. Ct. App. 2014) (citing cases); see Tooley, 845 A.2d at 1033 (focusing on who suffered the alleged harm and who would receive the benefit of any recovery); Shenker v. Laureate Educ., Inc., 983 A.2d 408, 424 (Md. 2009) (permitting a direct action "against alleged corporate wrongdoers when the shareholder suffers the harm directly or a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation"); see also Thompson, 35 J. Corp. L. at 220. "Cases where direct harm is suffered by shareholders include, for example, actions to enforce a shareholder's right to vote or right to inspect corporate records." Shenker, 983 A.2d at 424. Another example of direct harm to a shareholder is "a corporate manager fraudulently inducing [the shareholder] to decrease or increase his ownership of the corporation." Thompson, 35 J. Corp. L. at 220. Under the direct harm approach, "the examining court must compare the individual's harm to the company's harm." Dinuro Investments, 141 So. 2d at 735 (noting that "[a] majority of courts across the country appear to apply the 'direct harm test'").

### *Special Injury*

The second recognized method for determining whether a claim is direct or derivative is the "special injury" approach. Under this approach, "a claim is direct only if the shareholder has suffered an injury that is separate and distinct from any injury suffered by the corporation." Thompson, 35 J. Corp. L. at 221.

In a variation on the general "special injury" approach, a few jurisdictions have added a requirement that the plaintiff must allege a special injury that is "not only . . . distinct from an injury suffered by the corporation, but also from any injury suffered by all other shareholders of the corporation." Id.; see Dinuro Invs., 141 So. 3d at 736-37. This stricter "special injury" approach presents a high barrier to a potential shareholder plaintiff. "The most common examples of distinct and separate injuries that truly affect only one shareholder are injuries to a shareholder under a separate contract with the corporation, or claims that a corporation singled out a shareholder specifically for mistreatment." Thompson, 35 J. Corp. L. at 221.

*Duty Owed*

The third method is the "duty owed" approach. This approach requires a court to first decide whether a duty was breached and then, if so, determine to whom that duty was owed. Thompson, 35 J. Corp. L. at 222. "Under the duty owed test[,] a claim is direct if the right asserted by the shareholder 'flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation.'" Kleinberger, 58 Baylor L. Rev. at 107 (quoting Branch v. Ernst & Young, No. Civ. A. 93-10024-RGS, 1995 WL 791941, at *2, *4, *6 (D. Mass. Dec. 22, 1995)); see, e.g., Barger v. McCoy Hillard & Parks, 488 S.E.2d 215, 219 (N.C. 1997); Sw. Health & Wellness, L.L.C. v. Work, 639 S.E.2d 570, 575-76 (Ga. Ct. App. 2006). "This test simply examines the statutory and contractual terms to determine whether the duty at issue was owed to the individual . . . shareholder by a particular manager . . . , or whether those duties were owed to the company generally." Dinuro Invs., 141 So. 3d at 737 (citing G & N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 235 (Ind. 2001)).

Some courts have used a single analytical approach, others have utilized two or even three of them in combination. For example, some apply the "duty owed" approach "as an exception to the general rule requiring either direct harm or special injury." Dinuro Investments, 141 So. 2d at 737 (citing Harrington v. Batchelor, 781 So. 2d 1133, 1135 (Fla. Dist. Ct. App. 2001)); Shenker, 983 A.2d at 424. Others essentially utilize all three approaches at once by applying the "duty owed" and "special injury" approaches as exceptions to the general prohibition against a shareholder filing suit to recover for injuries to the corporation. Rivers v. Wachovia Corp., 665 F.3d 610, 616 (4th Cir. 2011) (quoting Barger, 488 S.E.2d at 219). In such a case, a shareholder would be permitted to bring a direct action if he was "directly harmed" by a "special injury" or a breach of a "duty owed."

**Tennessee Decision in *Hadden***

In 1988, the Tennessee Supreme Court set out its method for distinguishing a derivative claim from a direct claim in Hadden v. City of Gatlinburg, 746 S.W.2d 687, 689 (Tenn. 1988). In that case, Mr. and Mrs. Hadden and their daughter were the shareholders of a subchapter S closely-held corporation called the Greenbrier Lodge, Inc. ("Greenbrier Inc."). Greenbrier Inc. owned and operated a restaurant located on real property owned by Mr. and Mrs. Hadden as individuals. Hadden, 746 S.W.3d at 690. Greenbrier Inc. leased the property from Mr. and Mrs. Hadden for its business purposes. Id. at 688.

In 1981, the City of Gatlinburg began construction along the only road by which customers could access Greenbrier Inc.'s restaurant. During the nine months of construction, the road was often impassable and the restaurant's business declined. Based on this, Mr. and Mrs. Hadden filed a direct lawsuit for damages against the City for the loss of use of their property, based on a theory of temporary nuisance.[23] Id. at 688-89.

On the day of trial, the City moved to dismiss the Haddens' lawsuit on the grounds that the proper party, Greenbrier Inc., was not before the court. Id. at 689. In response, the Haddens argued that they, individually, were the proper parties to bring suit because Greenbrier Inc. was a closely-held corporation and the corporation's "losses were those of the plaintiff[s], the stockholders being man and wife." Id. The trial court agreed and held in favor of the Haddens; they were awarded damages for the diminution in the rental value of the property. Id. The Court of Appeals affirmed in a split decision, with the majority holding that the Haddens were proper plaintiffs "as landlords and stockholders" of Greenbrier Inc.[24] Id. at 688-89. The City appealed.

The Supreme Court reversed the lower court decisions, concluding that the Haddens had asserted no basis for recovery "either in [the] plaintiffs' 'own right' or as a subchapter-S corporation." Id. at 689. First, the Court observed that the Haddens were the landlords and Greenbrier Inc. was the tenant, and a cause of action for temporary nuisance belongs to the tenant, not the landlord. Id. at 689-90. The Court pointed out the general rule that shareholders have no right to recover for an injury to the corporation; that right belongs to the corporation. Id. at 689. Since the temporary nuisance claim belonged to the tenant, Greenbrier Inc., the Court held, the Haddens could not recover damages on their own behalf. Id. The Court then made a general statement about when a shareholder may bring a direct action:

> A corporation and its stockholders are distinct legal entities even if all the stock in the corporation is owned by one stockholder. Even a stockholder who is the sole shareholder of a corporation may not bring a suit to right a wrong done to the corporation[.] *Stockholders may bring an*

---

[23] The plaintiffs originally asserted a theory of inverse condemnation, but it was held on interlocutory appeal that the situation was only temporary and not the result of a "taking." Hadden, 746 S.W.3d at 689 n.1. Thereafter, the Haddens proceeded on the theory of temporary nuisance. Id.

[24] At the intermediate appellate court level, Judge Houston Goddard dissented from the majority. In his dissent, Judge Goddard cited the general rule in landlord/tenant law that the tenant, not the landlord, "is entitled to recover damages resulting for a temporary nuisance, unless there has been damage to the [landlord's] reversionary interest." Hadden v. City of Gatlinburg, 1987 WL 6269, at *5 (Tenn. Ct. App. Feb. 10, 1987) (Goddard, J., dissenting).

*action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer.*

Id. (emphasis added) (citations omitted). The Court went on to reject any exception to the general rule for subchapter S closely-held corporations. It acknowledged the Haddens' argument that, "as a practical matter the injury sustained by the corporation directly affected the plaintiffs." Id. at 690. Nevertheless, it held:

> [T]his fact does not entitle plaintiffs to bring a cause of action to recover damages sustained by the corporation, even where the corporation's status is that of a subchapter-S corporation under 26 U.S.C. § 1371. . . . [S]ubchapter-S status pertains only to a corporation and shareholder's tax liability and does not affect the general law of corporations.

Id. (citations omitted). The Court cautioned, "[W]here parties have deliberately undertaken to do business in corporate form, for tax purposes, accounting and other reasons, they must be held to the corporate form and they cannot shunt aside at their convenience legal entities and the legal aspects thereof." Id. (quoting Shelby Cnty. v. Barden, 527 S.W.2d 124, 130 (Tenn. 1975)). The Hadden Court reversed the Haddens' damage award and dismissed the case. Id. at 691.

The Hadden Court's description of when a shareholder may bring a direct action is this Court's most recent pronouncement on the method to be used in distinguishing between a direct and a derivative lawsuit. However, Hadden did not apply the stated exception to the facts presented in that case. Id. at 689-91. In fact, the Court's analysis indicates that the Haddens did not argue that they fit within an exception but contended instead that they should be permitted to recover in their capacity as landlords. See id. (noting that "[t]here was no injury to the reversionary interest" of the Haddens as landlords). Thus, while the Court in Hadden gave general parameters for the exception to the general rule against allowing shareholders to recover for corporate injury, the standard was not applied in that case, so lower courts did not receive the insight that comes with the application of an articulated standard to concrete facts.[25]

---

[25] In the years following Hadden, a few Tennessee courts have applied its stated standard to distinguish between a direct or derivative cause of action. See, e.g., Thompson v. Hayes, 748 F. Supp. 2d 824, 834 (E.D. Tenn. 2010) (holding that the plaintiff shareholders' breach of contract claim was derivative in nature under Hadden because it "essentially equate[d] the damage to the corporation with the damage to the [individuals]"); Wachtel v. Western Sizzlin Corp., 986 S.W.2d 2, 5 (Tenn. Ct. App. 1998) (holding that former president and CEO of corporation could assert a direct action for breach of employment contract under rule in Hadden); Franklin Capital Assocs., L.P. v. Almost Family, Inc., 194

The standard set forth in <u>Hadden</u> is far from clear. It appears to incorporate concepts from all three of the "direct/derivative" approaches discussed above: A shareholder may bring a direct action "for an injury done directly to them" (direct harm) that is "distinct from that incurred by the corporation" (special injury) "and arising out of a special duty owed to the shareholders by the wrongdoer" (duty owed). <u>Id.</u> at 689. As stated, the <u>Hadden</u> test uses the conjunctive, and so it appears to apply all three approaches at once. Under this interpretation, the <u>Hadden</u> standard would require a shareholder plaintiff to demonstrate direct harm that is both a special injury *and* one that arises out of a duty owed. However, the three cases cited by the <u>Hadden</u> Court in support of its stated method each apply only one of the described approaches; none applies all three together. <u>Id.</u> (citing <u>Grogan v. Garner</u>, 806 F.2d 829, 834-36 (8th Cir. 1986); <u>Schaffer v. Universal Rundle Corp.</u>, 397 F.2d 893 (5th Cir. 1968); <u>Martin v. Maldonado</u>, 572 P.2d 763, 773 (Alaska 1977)).

To compound this lack of clarity, one Tennessee Court of Appeals case purported to apply the approach in <u>Hadden</u> but inexplicably tacked on yet another requirement, namely, that a plaintiff shareholder must *also* establish that his injury is distinct from *all other* shareholders in order to maintain a direct action. <u>Cato</u>, 1996 WL 502500, at *5. In <u>Cato</u>, the plaintiff minority shareholder of a closely-held corporation filed a lawsuit against the corporation and two of its shareholders alleging both direct and derivative claims. In assessing the viability of the plaintiff's direct claims, the appellate court stated: "Stockholders may bring an individual action to recover for an injury done directly to them that is separate and distinct from any injury incurred by the corporation *or other shareholders*." <u>Id.</u> at *5 (emphasis added) (citing <u>Hadden</u>, 746 S.W.2d at 689). The intermediate appellate court opined that "a direct action will lie where a shareholder has suffered individual injury," and added: "It is imperative . . . that the shareholder be injured in a manner different from the manner in which other shareholders were injured in order to have standing to assert a direct action." <u>Id.</u> The <u>Cato</u> court cited no authority for appending this requirement to the standard stated in <u>Hadden</u>.[26]

The holding in <u>Cato</u>, specifically its misstatement of the <u>Hadden</u> test, led the Sixth Circuit to criticize the <u>Hadden</u> approach. See <u>McCarthy</u>, 466 F.3d at 408. In <u>McCarthy</u>, the Sixth Circuit was obliged to apply Tennessee law to determine whether certain of the plaintiffs' claims were derivative or direct. <u>McCarthy</u>, 466 F.3d at 408. The plaintiffs argued that Tennessee courts would not apply the test as stated in <u>Cato</u> but would instead

---

S.W.3d 392, 400-01 (Tenn. Ct. App. 2005) (deciding case as a direct action for breach of individual contract rights, citing <u>Wachtel</u>).

[26] We specifically disapprove of the <u>Cato</u> court's addition of this requirement.

use the approach adopted by the Delaware Supreme Court in <u>Tooley</u>. <u>See</u> <u>McCarthy</u>, 466 F.3d at 408-09 (citing <u>Tooley</u>, 845 A.2d at 1036, discussed below). The appellate court in <u>McCarthy</u> cited both <u>Cato</u> and <u>Hadden</u> as the controlling law in Tennessee, but also commented: "We agree with the plaintiffs that if presented with this issue, the Tennessee Supreme Court would likely adopt the rule articulated in <u>Tooley</u>, rather than adhering to its 1988 decision in <u>Hadden</u>." <u>Id.</u> at 409. Noting that the Tennessee Court of Appeals had characterized Delaware court decisions on corporate matters as "instructive," the Sixth Circuit predicted, "We believe that the supreme court [of Tennessee] would agree with the well-reasoned analysis in <u>Tooley</u>." <u>Id.</u> at 409-410 (citing <u>Bayberry Assocs. v. Jones</u>, No. 87-261-II, 1988 WL 137181, at *5 n.8 (Tenn. Ct. App. Nov. 9, 1988)). The <u>McCarthy</u> court's prognostication ended up being *dicta*, because the court concluded that the plaintiffs' claims would be considered derivative "under either the <u>Hadden</u>, <u>Cato</u>, or <u>Tooley</u> tests." <u>Id.</u> at 410.

## Delaware Decision in *Tooley*

As referenced by the Sixth Circuit in <u>McCarthy</u>, in 2004, the Delaware Supreme Court issued its decision in <u>Tooley v. Donaldson, Lufkin, & Jenrette, Inc.</u>, 845 A.2d 1031, 1036 (Del. 2004), in which it evaluated the methods previously used by Delaware courts to differentiate between a direct and a derivative claim. After doing so, it disapproved of some concepts that had traditionally been used in making that determination and distilled the analytical framework down to a two-part inquiry. <u>Tooley</u>, 845 A.2d at 1039. Since then, a number of courts in other jurisdictions have adopted the approach articulated in <u>Tooley</u>, so a review of the case is in order.

In <u>Tooley</u>, the plaintiff shareholders filed a class action alleging that members of the board of directors of their corporation breached their fiduciary duties by agreeing to delay the closing of a proposed merger by twenty-two days. The shareholders claimed that they were harmed by the delay in that, by the time they were finally paid for their shares, they had lost the time-value of the money. <u>Id.</u> at 1033. The trial court dismissed the case, holding that the plaintiffs failed to state a claim upon which relief could be granted and also holding that their claim was derivative, rather than direct, in nature. <u>Id.</u>

On appeal, the Delaware Supreme Court reviewed its prior caselaw distinguishing between direct and derivative lawsuits. It highlighted difficulties that had arisen from prior opinions that required the plaintiff shareholder to have suffered a "special injury,"[27]

---

[27] The <u>Tooley</u> Court noted that its prior cases had held that, to maintain a direct action in a case in which the alleged injury is to both the corporation and to the stockholder, the stockholder must allege a "special injury," but then failed to define the term "special injury." <u>Tooley</u>, 845 A.2d at 1037.

that required the plaintiff shareholder's injury to be separate and distinct from that suffered by other shareholders, and that held that an action cannot be considered direct if all shareholders are equally affected.[28]  Id. at 1036-1039.  It deemed these concepts "not helpful" and expressly disapproved of their use in determining whether a plaintiff shareholder's claim is direct or derivative.  Id. at 1033, 1039.  The Court then explained the proper focus of the inquiry:

> The proper analysis has been and should remain that . . . a court should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

Id. at 1039.

To facilitate the resolution of this issue in future cases, the Delaware Supreme Court sought to formulate a standard that would be "clear, simple and consistently articulated and applied by our courts."  Id. at 1036-37. It stated the standard as follows:

> We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

Id. at 1033.

---

[28] The Tooley Court noted that its prior cases had held that a suit must be maintained derivatively if the injury falls equally upon all stockholders, and then explained why this concept proved erroneous:

> Experience has shown this concept to be confusing and inaccurate.  It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished.  In that sense, the indirect injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings.  It does not arise out of any independent or direct harm to the stockholders, individually.  That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.

Id. at 1037.

On the facts presented, where the shareholders alleged that they had lost money because of a delay in the merger process, the Tooley Court reversed the trial court's conclusion that the shareholders' claims were derivative; instead, it held that the claims were direct, because the complaint alleged no harm to the corporation and requested "no relief that would go to the corporation."[29] Id.

## Adoption of *Tooley* Standard

In the instant case, the Buyers cite the Sixth Circuit's prediction in McCarthy and argue that "the Hadden holding has been questioned by the Sixth Circuit Court of Appeals." From this they contend: "[T]here is an open question regarding the basis for standing to bring suit for breach of fiduciary duty." The Buyers urge this Court to adopt the approach in Tooley.

At the outset, we observe that the approaches in Tooley and Hadden are not radically different from one another. The Tooley Court explains its standard by stating:

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

Tooley, 845 A.2d at 1039. Similarly, Hadden states that a court should consider whether the plaintiff shareholder seeks "to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer." Hadden, 746 S.W.2d at 689.

Nevertheless, as we have indicated, the Court's statement of the standard in Hadden was not a model of clarity, and the opinion offered little insight into how the standard should be applied. Moreover, since Hadden was decided nearly thirty years ago, this Court has not rendered an opinion that applies and clarifies the standard Hadden set forth. In the meantime, the law governing corporations in various jurisdictions has evolved.

---

[29] The Tooley Court ultimately affirmed the decision of the trial court, however, because the undisputed facts established that the merger agreement had not been breached and the plaintiffs failed to state a claim upon which relief could be granted. Tooley, 845 A.2d at 1039-40.

In contrast to <u>Hadden</u>, the <u>Tooley</u> Court addressed the issue of direct versus derivative actions in depth. "The <u>Tooley</u> test is a compilation of the most logical and easily applicable standards from the checkered history of the direct/derivative analysis." Zachary D. Olson, <u>Direct or Derivative: Does It Matter After Gentile v. Rossette?</u>, 33 J. Corp. L. 595, 622 (2008). In our view, the analytical framework the <u>Tooley</u> Court enunciated for distinguishing between direct and derivative actions is clear, understandable, and sensible.[30]

"The general rule as articulated by the Delaware court in <u>Tooley</u> has been cited and applied in a host of jurisdictions." <u>Lightner v. Lightner</u>, 266 P.3d 539, 548 (Kan. Ct. App. 2011). In addressing how to distinguish between derivative and direct actions, commentators almost invariably include <u>Tooley</u> in their analysis. <u>See, e.g.</u>, 2 Bus. & Com. Litig. Fed. Cts. § 20:3 (3d ed. Updated 2015); 35 J. Corp. L. at 223; Kleinberger, 58 Baylor L. Rev. at 103-04. Intermediate appellate state courts and federal courts required to apply state law likewise include the <u>Tooley</u> standard in their discussion, even if the court is without authority to change the standard to be applied in the specific state. <u>See</u>, <u>e.g.</u>, <u>Kepley v. Lanz</u>, 715 F.3d 969, 973 (6th Cir. 2013) (noting similarities in Kentucky law and <u>Tooley</u>, even though Kentucky "has yet to render a decision articulating a particular test to be applied in determining whether a claim is direct or derivative under these circumstances"); <u>Royal Park Invs. SA/NV v. HSBC Bank USA</u>, 109 F. Supp. 3d 587, 613 (S.D.N.Y. 2015) (noting that <u>Tooley</u> is consistent with New York law and that the New York Court of Appeals would likely follow it); <u>Lewis v. Seneff</u>, 654 F. Supp. 2d 1349, 1366-67 (M.D. Fla. 2009) (discussing <u>Tooley</u> but declining to apply it because Florida had not yet "considered or discussed the <u>Tooley</u> decision"); <u>Estate of Browne v. Thompson</u>, 727 S.E.2d 573, 576 (N.C. Ct. App. 2012) (refusing to apply <u>Tooley</u> because the Supreme Court of North Carolina had not done so and intermediate court could not "blithely disregard [the Supreme Court's] holding"). <u>Tooley</u>'s standard is increasingly cited with approval as the issue makes its way up to the supreme courts of the various states. <u>See</u> <u>e.g.</u>, <u>Lightner</u>, 266 P.3d at 548 (adopting

---

[30] Since <u>Tooley</u> was decided, the Delaware Supreme Court has continued to adhere to the analytical framework it put forth and has refined its application. <u>See, e.g.</u>, <u>Culverhouse v. Paulson & Co., Inc.</u>, 133 A.2d 195, 198 (Del. 2016) (adhering to the test in <u>Tooley</u>); <u>NAF Holdings, LLC v. Li & Fung (Trading) Ltd.</u>, 118 A.3d 175, 176 (Del. 2015) (explaining that "[t]he case law under [<u>Tooley</u>] and its progeny deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively," and that <u>Tooley</u> "has no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights"); <u>Feldman v. Cutaia</u>, 951 A.2d 727, 733 (Del. 2008) (following <u>Tooley</u> but recognizing that a claim is derivative when "all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders"); <u>Gentile v. Rossette</u>, 906 A.2d 91, 99 (Del. 2006) (indicating that "equal 'injury' to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually").

Tooley); Shenker, 983 A.2d at 424 (citing Tooley with approval); In re Medtronic, Inc., No. A15-0858, 2016 WL 281237, at *3 (Minn. Ct. App. Jan. 25, 2016) (adopting Tooley as consistent with Minnesota case law and because Minnesota courts infrequently review shareholder derivative actions); Rael v. Page, 222 P.3d 678, 683 (N.M. Ct. App. 2009) (relying on Tooley because Delaware law is consistent with New Mexico law on the relevant issue); Yudell v. Gilbert, 99 A.D.3d 108, 110 (N.Y. App. Div. 2012) ("The Tooley test is consistent with New York law and has the added advantage of providing a clear and simple framework to determine whether a claim is direct or derivative."); Frost v. Zeff, Nos. 827 EDA 2015, 829 EDA 2015, 2015 WL 8552111, at *4 (Pa. Super. Ct. Dec. 11, 2015) (citing Tooley, along with other Pennsylvania cases, in its analysis).

Under all of these circumstances, we deem it prudent to set aside the approach for determining whether a shareholder claim is direct or derivative described by this Court in Hadden and adopt for Tennessee the analytical framework enunciated by the Delaware Supreme Court in Tooley.[31] We believe that Tooley captures the aims and principles discussed in Hadden and other Tennessee caselaw, and it sets forth a framework that is clear and easily understood. Adoption of the Tooley standard for Tennessee allows our lawyers and our courts to utilize the rich body of law in other jurisdictions for guidance in applying the Tooley standard. This in turn should facilitate consistent and predictable outcomes in disputes involving shareholder claims.

**Application of Tooley**

Applying the Tooley standard—or for that matter any standard—to the counterclaim in this case is a challenge. By the time the counterclaim was filed, these parties had been embroiled in years of litigation against one another, including a lengthy trial and an agreed, court-managed dissolution of their family corporation. The allegations in the Buyers' counterclaim must be viewed against the backdrop of these prior proceedings.

We will briefly review the components of the counterclaim. The trial court grouped the Buyers' claims into three general categories: (1) Louie's willful and intentional violation of the trial court's orders, (2) Louie's breach of his fiduciary duty to

---

[31] To be clear, we set aside the following statement in Hadden: "Stockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer." Hadden, 746 S.W.2d at 689. As noted above, this described standard was not applied under the facts presented in Hadden. The remainder of the Hadden opinion is unaffected by our holding.

the original MBI,[32] and (3) Louie's intentional interference with business relations. As to all of these categories, the Buyers asserted that they were harmed as individuals and that they should personally recover for the injury caused by the wrongful conduct of Louie and his cohorts. The Buyers claimed that Louie intentionally sabotaged the grease business assets that they had agreed to purchase, in contravention of the trial court's orders directing all parties to preserve the assets for the Buyers. As a result, the Buyers claimed, the grease business assets were worth less at closing than the agreed-upon purchase amount, *i.e.*, they did not receive the benefit of their bargain. The Buyers sought both compensatory and punitive damages, as well as a permanent injunction enjoining Louie from operating his competing grease business on the Massman Drive property.

The trial court did not address whether any specific category of claims alleged was derivative or direct in nature, and, for purposes of awarding damages, it aggregated all of the Buyers' claims. It dismissed Louie's entire standing argument in a footnote. In contrast, the Court of Appeals painstakingly sorted through the Buyers' claims to determine whether they were direct or derivative in nature for purposes of standing. Ultimately, however, the Court of Appeals concluded that the Buyers lacked standing as to all of their claims for the same reason: McRedmond Feed was the ultimate purchaser of the grease business assets at closing, so any action by Louie that resulted in a diminution of the value of the grease business assets injured McRedmond Feed, not the Buyers as individuals. McRedmond, 2014 WL 6324283, at *17.

We, too, will endeavor to sort through the Buyers' claims, first to determine the claims to which the Tooley standard should, and should not, be applied. As to the claims for which the direct/derivative determination must be made, we will apply the Tooley standard as adopted herein.

We first consider the Buyers' claim for damages based on violation of the trial court's orders. While not specifically phrased as such, this is essentially a claim for damages arising from civil contempt. See Overnite Transp. Co. v. Teamsters Local Union No. 480, 172 S.W.3d 507, 511 (Tenn. 2005) (holding that "damages are available to a party injured by a contemnor's acts in violation of a court's order," relying on Tenn. Code Ann. § 29-9-105 (1980 & 2000)). At the time the trial court's orders were in place, neither the original MBI nor the Buyers' new corporation McRedmond Feed was a party to the litigation. The trial court's orders were clearly intended as for the benefit of the

---

[32] Unfortunately, in the counterclaim, the Buyers did not distinguish between the original MBI and the new MBI and instead simply made allegations involving "McRedmond Brothers, Inc." With respect to the Buyers' claims that Louie breached his fiduciary duty to MBI, however, "McRedmond Brothers, Inc." must necessarily be a reference to the original MBI, because Louie was never involved in the new MBI in any capacity.

Buyers in the anticipated purchase of the grease business assets. The April 1, 2009 order required "the current officers and directors of the Grease Business Assets," which included Louie, to "[c]onduct the Business only in the usual, regular and ordinary course, preserve the organizational structure of the Business, and preserve intact *for the Buyer* the goodwill of the Business and the present relationship between the Business and the employees, suppliers, clients, customers and others having business relations with the Seller." (Emphasis added).

Thus, the trial court's order was entered *expressly* for the benefit of "the Buyer" of the business assets. Regardless of whether the trial court's orders were right or wrong, Louie was obliged to abide by them, and if the Buyers were ultimately injured by his violation of the trial court's orders, they are entitled to sue him for damages.

This claim by the Buyers may be likened to one in which "a party to a commercial contract . . . sues to enforce its contractual rights." NAF Holdings, 118 A.3d at 176. In NAF Holdings, the plaintiff was a party to a contract; the third-party beneficiary of the contract was a corporation in which the plaintiff owned stock. In such a situation, even if "the third-party beneficiary of the contract is a corporation in which the [plaintiff] owns stock; and . . . the [plaintiff's] loss derives indirectly from the loss suffered by the third-party beneficiary corporation," the plaintiff may bring a direct action to enforce his contractual rights. Id. The Delaware Court explained:

> Although the relationship of that party to the third-party beneficiary might well have relevance in determining whether the contract claim is viable as a matter of contract law, nothing in Delaware law requires the promisee-plaintiff's contract claim to be prosecuted as a derivative action.
>
> The case law under Tooley v. Donaldson, Lufkin & Jenrette and its progeny deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively. That body of law has no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights.

Id. Thus, Tooley does not apply "to convert direct claims belonging to a plaintiff into something belonging to another party," even where the claims involve contemplated benefit to both the plaintiff and the corporation. Id. at 176, 180. In the case at bar, the Buyers sued to enforce their "own rights" as the parties for whose benefit the trial court's orders were entered.

We respectfully disagree with the Court of Appeals' reasoning that the Buyers failed to allege individual injury separate from the injury suffered by the corporation. While McRedmond Feed might have suffered residual loss of business or lost profits from Louie's alleged violation of the trial court's orders, the Buyers were injured individually to the extent that they signed agreed orders and contracts regarding the purchase price of the original MBI's grease business assets, including its goodwill and business relationships. The Buyers arranged for appropriate financing and capitalized the new corporation, McRedmond Feed, which they formed to operate the grease business once the assets were transferred to the corporation. The undisputed facts show that the Buyers' capitalization of McRedmond Feed was based on the value of the assets in their preserved state, as is evidenced by the trial court's orders and the Asset Purchase Agreement that was signed by the parties and incorporated into the trial court's April 1, 2009 order. Protection of the status quo, so that the Buyers would receive the benefit of their bargain, was the express premise of the trial court's orders. Under these circumstances, the Buyers suffered injury that "stood sufficiently apart from harm to the corporation itself," direct harm distinct from any harm to the corporation. Guarnieri v. Guarnieri, 936 A.2d 254, 262 (Conn. Ct. App. 2007). Thus, the Buyers had standing to maintain its action for civil contempt against Louie.

We next consider the Buyers' counterclaim for Louie's breach of his fiduciary duty. "The directors and officers of a corporation owe a fiduciary duty to the corporation and to its shareholders." Sanford v. Waugh & Co., 328 S.W.3d 836, 843 (Tenn. 2010). As fiduciaries, they have a duty to "act in the utmost good faith," and, in a close corporation, they have a duty "to give to the enterprise the benefit of their care and best judgment and to exercise the powers conferred solely in the interest of the corporation . . . and not for their own personal interests." Id. at 843-44. The Buyers assert that Louie violated his fiduciary duty to the original MBI by engaging in conduct that benefitted himself, to the detriment of the corporation. They allege, in essence, that Louie engaged in mismanagement and/or self-dealing at the expense of the corporation.

Tooley "deal[s] with the distinct question of when a cause of action for breach of fiduciary duty . . . must be asserted derivatively." NAF Holdings, 118 A.3d at 176. To determine whether an action is derivative or direct in nature under Tooley, we must look to "the nature of the wrong and to whom the relief should go." Tooley, 845 A.2d at 1039. In this context, we ask: "Who suffered the alleged harm—the corporation or the suing shareholder individually—and who would receive the benefit of the recovery or other remedy?" Id. at 1035. To prove that the Buyers individually suffered the harm from the breach of fiduciary duty, they "must demonstrate that the duty breached was owed to [them] and that [they] can prevail without showing an injury to the corporation." Id. at 1039.

- 33 -

In their counterclaim, the Buyers allege that Louie owed a special duty to *the corporation*, not to them individually.[33] Tooley teaches that any action by shareholders for harm resulting from a breach of fiduciary duty to the corporation arising from mismanagement and self-dealing belongs to the corporation, not to the shareholders. See id. at 1038 (noting that a claim of mismanagement was properly found to be derivative, citing with approval the holding in Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 351-52 (Del. 1988)). Therefore, under Tooley, the Buyers' claim that Louie breached his fiduciary duty to MBI through mismanagement and self-dealing is derivative in nature and must be asserted derivatively on behalf of the corporation itself. Consequently, the Buyers do not have standing to recover individually for any harm resulting from Louie's breach of his fiduciary duty to the original MBI.

The third theory of recovery on which the Buyers based their counterclaim was Louie's intentional interference with business relations. The allegations in the counterclaim that fit in this category are less than clear, but they focus on conduct by Louie that occurred after he began operating LAMI. They claimed that Louie operated his competing business on the Massman Drive premises "in a manner calculated to inhibit, impair, annoy, and interfere with MBI."[34] It is undisputed in the record that Louie did not "operate" LAMI and the Buyers did not operate their own business until after the closing.

As to the Buyers' claim of interference with business relations, the initial question is: "[D]oes the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?" NAF Holdings, 118 A.3d at 180. Since Louie did not operate LAMI until after the closing, we must conclude that any alleged interference with business relations must have related to Louie's interruption of McRedmond Feed's business relations. Although the Buyers assert that Louie interfered with *their* business relations, the Buyers did not themselves have business relations apart from their investment and involvement in McRedmond Feed. From our review of the Buyers' allegations, we agree with the Court of Appeals that the claim of "intentional interference

---

[33] The Buyers did not allege that they were harmed by Louie's breach of fiduciary duty to them as equal or minority stockholders of MBI. See generally Nelson v. Martin, 958 S.W.2d 643, 647-48 (Tenn. 1997), overruled on other grounds by Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002); Hall v. Tenn. Dressed Beef Co., 957 S.W.2d 536, 541 (Tenn. 1997). Rather, the Buyers, as shareholders of MBI, sought to recover personally for Louie's breach of his duty to the corporation.

[34] The trial court generally found in favor of the Buyers but did not address interference with business relations separately, so its findings do not clarify anything with respect to this claim. We also note that, in its holding, the trial court found a breach of the covenant of good faith and fair dealing, which leaves us slightly mystified. The only contract to which such a covenant could attach is the Asset Purchase Agreement, and Louie was not a party to that agreement.

with business relations" belongs to the Buyers' corporation McRedmond Feed, not to the Buyers individually.[35]

Finally, the Buyers urge this Court to make an exception to the general rule prohibiting a shareholder from asserting a claim belonging to the corporation based on the fact that this is a subchapter S, closely-held corporation.[36] They argue that, because they are shareholders in a closely-held corporation, they are more like partners in a partnership who are harmed individually when the corporation is harmed. We recognize that some courts are inclined to treat claims against closely-held corporations as direct in nature under some circumstances.[37] However, we are not inclined to do so in this case. A similar argument was made and rejected in Hadden. The Hadden Court held that, where parties have deliberately chosen to do business in corporate form for other reasons such as tax or accounting purposes, they cannot disregard the corporate form "at their convenience." Hadden, 746 S.W.2d at 689-90. Moreover, the Hadden Court held that,

---

[35] We note that some of the proof at trial focused on McRedmond Feed's lost profits resulting from Louie's solicitation of Tyson's business, both before and after the closing. While the Buyers do not have standing to recover the lost profits suffered by the corporation generally, the evidence of lost profits resulting from Louie's pre-closing conduct would still be probative of the adverse effect Louie's conduct had on the value of the grease business assets at the time of the closing.

[36] The term "subchapter S" corporation is not a state law concept. Rather, it is a small business corporation, having less than 100 stockholders, that is formed pursuant to 26 U.S.C. § 1361-1379. See 26 U.S.C. § 1361(b). By electing subchapter S status, a closely-held corporation gets the benefit of limited liability (like a larger corporation) but is relieved of the burden of double taxation—"[t]he corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." Gitlitz v. Comm'r of Internal Revenue, 531 U.S. 206, 209 (2001) (citing 26 U.S.C. § 1366(a)(1)(A)); see Bufferd v. Comm'r of Internal Revenue, 506 U.S. 523, 524-25 (1993). In other words, stockholders of closely-held, subchapter S corporations have limited liability, but they are taxed like partnerships. See Bufferd, 506 U.S. at 525.

[37] Some jurisdictions grant trial courts the discretion to permit a shareholder in a closely-held corporation to bring a direct action to recover for injury to the corporation, even when such a claim would be derivative. See Gebauer, 10 A.L.R.6th at § 4 (citing cases "representing opinions from almost half the states"). Some have likened this additional twist to a reverse application of the principle of "piercing the corporate veil." See Shareholder Deriv. Actions L. & Prac. § 2:5 (2015-2016). The American Law Institute has proposed a standard that would give the trial court discretion to allow such a claim. See American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.01(d), at 17 (1994). This standard has been adopted by several courts. See Durham v. Durham, 871 A.2d 41, 45-46 (N.H. 2005) (quoting ALI flexible standard); see also Barth v. Barth, 659 N.E.2d 559, 562 (Ind. 1995); Norman v. Nash Johnson & Sons' Farms, Inc., 537 S.E.2d 248, 255-56 (N.C. Ct. App. 2000); Schumacher v. Schumacher, 469 N.W.2d 793, 798-99 (N.D. 1991). But see Wessin v. Archives Corp., 592 N.W.2d 460, 466 (Minn. 1999) (rejecting exception and noting that "a closely held corporation is still a corporation with all of the rights and limitations proscribed by the legislature"); Landstrom v. Shaver, 561 N.W.2d 1, 14-15 (S.D. 1997) (rejecting exception proposed by the American Law Institute).

even when the parties do not strictly observe the corporate form, "this fact does not entitle [shareholders] to bring a cause of action to recover damages sustained by the corporation, even where the corporation's status is that of a subchapter-S corporation." Id. at 690. Thus, Hadden rejected essentially the same argument made by the Buyers, and we are not inclined to revisit that ruling under the circumstances of this case.

In sum, we hold that the Buyers have standing to assert a claim against Louie for violation of the trial court's orders and to recover their actual damages arising out of his contemptuous conduct. We affirm the Court of Appeals' holding, however, that the Buyers do not have standing to bring a direct claim for damages resulting from Louie's breach of his fiduciary duty to the original MBI or resulting from Louie's intentional interference with business relations.

Because the Buyers have standing to assert their claim based on Louie's contempt, we must reverse the decision of the Court of Appeals to the extent that it is inconsistent with our ruling. It appears from this record that the parties raised numerous other issues in the interlocutory appeal. We remand this case to the Court of Appeals to review the remaining issues that were properly raised in light of our holding herein.[38]

CONCLUSION

In sum, we set aside the approach in Hadden v. City of Gatlinburg, 746 S.W.2d 687 (Tenn. 1988), for determining whether a shareholder claim is derivative or direct in nature, and we adopt in its stead the analytical framework enunciated by the Delaware Supreme Court in Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031 (Del. 2004). Applying Tooley, we affirm the Court of Appeals' holding that the Buyers lacked standing to assert a direct claim based on Louie's breach of fiduciary duty to MBI. As to the claims based on a theory of intentional interference with business relations, we hold that any such claims belonged to the new corporation (McRedmond Feed) and that the Buyers, therefore, lacked standing to assert them. The Buyers have standing, however, to assert claims of civil contempt against Louie for any actual damages that arose out of his violation of the trial court's orders. We remand the case to the Court of Appeals to address the issues that were properly raised but not addressed by that court in the first appeal.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the Court of Appeals for further proceedings consistent with this Opinion. Costs on appeal are to be taxed equally, one half to Appellants Estate of

---

[38] The Court of Appeals may, in its discretion, decide which issues were properly certified and raised before that court in the interlocutory appeal.

Edward Stephen McRedmond, Anita Sheridan, and Linda Orsagh, and one half to Appellee Louis A. McRedmond, for which execution may issue, if necessary.


_____

HOLLY KIRBY, JUSTICE