IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE FAIRPOINT | § | |
| INSURANCE COVERAGE | § | No. 478, 2022 |
| APPEALS | § | No. 479, 2022 |
| | § | No. 480, 2022 |
| | § | |
| | § | |
| | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| | § | |
| | § | C.A. No. N18C-08-086 (N) |
| | § | |

Submitted: September 20, 2023
Decided: December 15, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **REVERSED**.

Kurt M. Heyman, Esquire (*argued*), Aaron M. Nelson, Esquire, Kelly E. Rowe, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Scott B. Schreiber, Esquire, William C. Purdue, Esquire, Samuel I. Ferenc, Esquire, Matthew L. Farley, Esquire; ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., *for Defendant Below, Appellant Nation Union Fire Insurance Company of Pittsburg, Pa.*

Tammy Yuen, Esquire, Juan Luis Garcia, Esquire, SKARZYNSKI MARICK & BLACK, LLP, New York, New York; Bruce E. Jameson, Esquire, John G. Day, Esquire, PRICKETT, JONES, & ELLIOTT, P.A., Wilmington, Delaware, *for Defendant Below, Appellant XL Specialty Insurance Company*.

Ronald P. Schiller, Esquire, Daniel J. Layden, Esquire, HANGLEY ARONCHIK SEGAL PUDLIN & SCHILLER, Philadelphia, Pennsylvania; Robert J. Katzenstein, Esquire, SMITH KATZENSTEIN & JENKINS LLPP, Wilmington, Delaware, *for Defendants Below, Appellants National Specialty Insurance Company, AXIS Insurance Company, and St. Paul Mercury Insurance Company.*

Michael R. Goodstein, Esquire, BAILEY CAVALIERI, Columbus, Ohio, *for Defendant Below, Appellant AXIS Insurance Company*.

Thomas J. Judge, Esquire, Jason C. Reichlyn, Esquire, DYKEMA GOSSETT, PLLC, Washington, District of Columbia, *for Defendant Below, Appellant St. Paul Mercury Insurance Company*.

Jennifer C. Wasson, Esquire, Carla M. Jones, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, Robin L. Cohen, Esquire, Keith McKenna, Esquire (*argued*), Meredith Elkins, Esquire, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York; *for Plaintiffs Below, Appellees Verizon Communications Inc., NYNEX LLC, Verizon New England Inc., and Verizon Information Technologies LLC*.

**SEITZ**, Chief Justice:

In this appeal we once again interpret the definition of a "Securities Claim" in corporate insurance policies. As part of a comprehensive definition, the insurance policies defined a Securities Claim as a Claim against the Insured "brought derivatively on behalf of an Organization by a security holder of such Organization." The Superior Court held that a post-bankruptcy litigation trust's state law fraudulent transfer claims were derivative claims and therefore qualified as a Securities Claim under the policies. We disagree and reverse. The litigation trust's post-bankruptcy fraudulent transfer claims were direct, not derivative, as understood by securities and corporate law and therefore not covered by the policies.

I.

A.

The facts relevant to this appeal are, for the most part, undisputed. In 2008, Verizon Communications, Inc. used a Reverse Morris Trust structure to sell its landline assets in New Hampshire, Vermont, and Maine to FairPoint Communications Inc. ("the Spinoff").[1] As part of the deal, Verizon incorporated

---

[1] Other Verizon-affiliated parties are NYNEX LLC, Verizon New England, Inc., and Verizon Information Technologies LLC. For ease of reference, we will refer to these parties as "Verizon" unless the context requires otherwise. A Reverse Morris Trust structure is the tax-free sale of a subsidiary through its spin off and subsequent sale. *See In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 502 (S.D.N.Y. 2019). In this structure, a parent company spins off and transfers assets to a subsidiary. The subsidiary merges with a third-party company to form a new company. The new company then issues shares to shareholders of the parent company. *See Costanzo v. DXC Tech. Co.*, 2020 WL 4284838, at *1 (N.D. Cal. July 27, 2020).

Northern New England Spinco, Inc. ("Spinco") as a wholly owned Verizon subsidiary and transferred the three-state landline assets to Spinco in exchange for cash, Spinco stock, and more than $500 million in Spinco debt securities (the "Spinco Notes").[2] Verizon then distributed its Spinco stock to Verizon stockholders, and Spinco merged into and became part of FairPoint.[3] Verizon exchanged the Spinco Notes with investment banks for Verizon commercial paper, and the investment banks sold the Spinco Notes to public purchasers ("Noteholders").[4] After the Spinoff, FairPoint owned Verizon's three-state landline assets with FairPoint assuming the debt obligation to Verizon for the Spinco Notes.[5]

## B.

Eighteen months later, FairPoint could not service its debt, which caused FairPoint and certain affiliates to file for voluntary Chapter 11 reorganization. In the FairPoint bankruptcy proceedings, the Noteholders filed proofs of claims seeking repayment of the Notes. FairPoint exited bankruptcy with a joint reorganization Plan. Under the Plan, the FairPoint bankruptcy estate resolved the claims of the Noteholders and other unsecured creditors (collectively, "Creditors") by creating a litigation trust (the "Litigation Trust"). The Creditors received interests in the

---

[2] A264 (Defendants' Opening Br. in Support of Their Motion for Summary Judgment).
[3] A117 (Complaint).
[4] A266-67 (Defendants' Opening Br. in Support of Their Motion for Summary Judgment).
[5] A1072 (First Supplemental Indenture).

Litigation Trust. The FairPoint bankruptcy estate transferred to the Litigation Trust the right to pursue litigation against Verizon arising out of the Spinoff transaction.[6]

## C.

On October 25, 2011, the Litigation Trust filed fraudulent transfer claims in North Carolina state court against Verizon and its affiliates. It sought to recoup over $2 billion that Verizon received from the Spinco transaction. Verizon removed the state court complaint to federal court in North Carolina. The federal district court granted partial summary judgment to Verizon on some of the fraudulent transfer claims.[7] After a bench trial, but before the court ruled on what remained of the fraudulent transfer claims, Verizon and the Litigation Trust settled, with Verizon agreeing to pay the Litigation Trust $95 million after it incurred almost $24 million in defense costs.[8]

## D.

After the settlement, Verizon focused on two sources of insurance to cover the settlement payment and defense costs – a transaction-specific primary policy with National Union Fire Insurance Company of Pittsburgh, PA ("Transaction Policy") with two follow-form excess policies; and a primary Directors' and

---

[6] *See In re FairPoint Commc'ns Inc.*, 452 B.R. 21, 23-24 (S.D.N.Y. 2011).
[7] *FairPoint Commc'ns, Inc. v. Verizon Commc'ns Inc.*, C.A. No. 3:11-cv-00597-MOC-DCK (W.D.N.C. June 12, 2013) (order granting in part and denying in part motion for summary judgment).
[8] A2223 (Settlement Agreement).

Officers' liability policy also with National Union ("Verizon Policy") with three follow-form excess policies (collectively, the "Policies").[9]

1.

The Transaction Policy covered as Insureds FairPoint, Verizon, Spinco, their subsidiaries, and the directors and officers of those entities. It had a main policy form with endorsements. The endorsements included "Deal Specific Run-Off Multiparty Coverage" with three insuring agreements. Under one of the three insuring agreements, National Union agreed to pay "the Loss of any Organization arising from a Securities Claim made against such Organization for any Wrongful Act of such Organization on or prior to the Effective Time."[10] "Loss" includes settlement and defense costs, and "Organization" included FairPoint, Verizon, Spinco, and their subsidiaries.

In the Transaction Policy, a "Securities Claim" is defined as a Claim made against any Insured:

> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

---

[9] XL Specialty Insurance Company and National Specialty Insurance Company are the excess insurers in the Transaction Policy. A229. Axis Insurance Company, U.S. Specialty Insurance Company, and St. Paul Mercury Insurance Company are the excess insurers for the Verizon Policy. A230. The excess policies follow form to the primary Policies. Thus, we address only the primary Policies in this opinion.

[10] A1762.

(a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an Organization; or

(b) brought by a security holder of an Organization with respect to such security holder's interest in securities of such Organization; or

(2) brought derivatively on the behalf of an Organization by a security holder of such Organization.[11]

The Transaction Policy also covers claims brought by the trustee of an Organization in any bankruptcy proceeding of such Organization.[12] Section 19 of the Transaction Policy states that the "Bankruptcy or Insolvency of any Organization or Insured Person shall not relieve the Insurer of any of its obligations hereunder."[13]

2.

The Verizon Policy, renewed on an annual basis, provided Directors' and Officers' liability coverage as Insureds to Verizon and any subsidiary, including entities controlled by Verizon on or before the Verizon Policy date, such as Spinco.[14] The Verizon Policy, like the Transaction Policy, used a main policy form with endorsements, with one endorsement containing three insuring agreements. Under one of the three insuring agreements, National Union agreed to pay "the Loss of any

---

[11] A1783 (Transaction Policy).
[12] A1708 (Transaction Policy).
[13] A1716 (Transaction Policy).
[14] A1783, A1810, A1845 (Verizon Policy).

Organization arising from a Securities Claim made against such Organization for any Wrongful Act of such Organization."[15]  The Securities Claim definition in the Verizon Policy is identical to the definition in the Transaction Policy.[16]

E.

The Insurers denied coverage for the Trust Action settlement and defense costs, which triggered Verizon's suit against the Insurers.  At the time Verizon filed this suit, the Superior Court had decided another insurance coverage dispute between Verizon and its insurers involving the Idearc bankruptcy.[17]  In its Idearc insurance coverage complaint, Verizon claimed that the bankruptcy trustee's fraudulent transfer claims against Verizon met the definition of a Securities Claim in the policies – defined as "violations of regulations, rules, or statutes regulating securities."[18]  The Superior Court agreed with Verizon that the fraudulent transfer claims and other common law claims brought against Verizon by the bankruptcy trustee were Securities Claims and therefore covered under the insurance policies.

---

[15] The Verizon Policy differed from the Transaction Policy in other respects.  The Insurers raised defenses specific to the Verizon Policy.  In light of our decision that the fraudulent transfer claims do not meet the definition of a Securities Claim under either policy, we need not reach the Insurer's Verizon Policy-specific arguments.

[16] *Compare* A1706 (Verizon Policy), *with* A1783 (Transaction Policy).

[17] *Verizon Commc'ns Inc. v. Illinois Nat'l Ins. Co.*, 2017 WL 1149118 (Del. Super. Ct. Mar. 2, 2017), *rev'd sub nom. In re Verizon Ins. Coverage Appeals*, 222 A.3d 566 (Del. 2019).

[18] *Id.* at *9.

Verizon took advantage of that ruling in this case to argue that the Securities Claim definition in the Policies covered the Trust Action.[19] National Union, however, filed an appeal from the Superior Court's *Idearc* decision while this litigation was pending. In the *Idearc* appeal, we reversed the Superior Court and ruled that the litigation trustee's claims did not fall within the definition of a Securities Claim.[20] Following our *Idearc* appellate decision, Verizon shifted its focus to Section (2) of the Securities Claim definition in both policies.[21]

F.

After skirmishing over venue,[22] the Insureds moved for summary judgment under the Transaction Policy, and the Insurers cross-moved for judgment on the pleadings as to coverage on both Policies.[23] In its first merits decision, the Superior Court granted the Insureds' motion and denied the Insurers' motion.[24] The Superior Court began by distinguishing Section (2) of the Securities Claim definition in this

---

[19] A156-57 (Plaintiffs' Opposition to Defendants' Motion to Dismiss or Stay this Action).

[20] *In re Verizon Insurance Coverage Appeals*, 222 A.3d 566, 569 (Del. 2019) [hereinafter *Idearc*].

[21] A205 (Plaintiffs' Opening Brief in Support of Their Motion for Summary Judgment on Defense Costs).

[22] *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co.*, 2019 WL 2517418, at *1 (Del. Super. Ct. Apr. 26, 2019).

[23] A187 n.1 (Plaintiffs' Opening Brief in Support of Their Motion for Partial Summary Judgment on Defense Costs); A216 (Defendants' Opening Brief in Support of Their Motion for Judgment on the Pleadings); *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co.*, 2021 WL 710816, at *1 (Del. Super. Ct. Feb. 23, 2021) [hereinafter Transaction Policy Opinion]. The Insurers cross-moved for judgment on the pleadings because they denied all coverage under the Policies.

[24] The court denied the Insurers' motion because Verizon owned 100% of Spinco before the policy period and the parties intended the deal specific endorsement to expand coverage to all liabilities incurred in the deal to a maximum extent. Transaction Policy Opinion, at *1, *15-16.

case from the Section (2) definition in the *Idearc* litigation. The court believed that Section (2)'s Securities Claim definition in this case was "critically different" because it did not include language referring to the definition in Section (1) – "brought derivatively on the behalf of an Organization by a security holder of such Organization, *relating to a Securities Claim as defined in paragraph (1) above*."[25] According to the court, the absence of the italicized language in Section (2) of the Policies meant that Verizon did not have to satisfy the "regulating-securities" requirement in Section (1).

Next, through a multi-step analysis, the court held that the Trust Action met the plain meaning definition of a Securities Claim in the Transaction Policy. According to the Superior Court:

- the Spinco Notes qualified as "securities;"[26]

- the Bankruptcy Trustee was a "security holder" by virtue of the Bankruptcy Code because only the Trustee can bring claims on behalf of the bankruptcy estate;[27]

- the Litigation Trust trustee brought the Trust Action as a "security holder" because the actual security holders could not bring the claims;[28]

- the Litigation Trust did not have to "hold" the securities because imposing this requirement would negate the bankruptcy provisions of the policies;[29]

---

[25] *Id.* at *7 (emphasis added).
[26] *Id.* at *8.
[27] *Id.* at *9.
[28] *Id.*
[29] *Id.*

10

- the Trust Action was a derivative action because the claim was brought on behalf of the estate to benefit all creditors;[30]

- the "brought derivatively" requirement was not limited to stockholder derivative actions but also included bankruptcy-related claims brought derivatively;[31] and

- a claim brought for the debtor's estate was a claim "brought on behalf of" the entity filing for bankruptcy.[32]

Finally, the court found that the Insurers had waived any challenges to the reasonableness of Verizon's litigation expenses.[33]

G.

Following discovery, the parties filed cross-motions for summary judgment.[34] The Superior Court granted Verizon's motion and denied the Insurers' motion. The court decided that the Trust Action met the definition of Securities Claim in the Verizon Policy for the following reasons:

- the Litigation Trustee acted as a "security holder" because the Litigation Trust prosecuted Spinco Noteholders' claims that transferred to the bankruptcy estate upon the bankruptcy filing;[35]

- the Trust Action was a derivative action because Spinco's causes of action automatically passed to FairPoint at the time of the merger, and then passed to the Trustee at the time of the bankruptcy;[36]

---

[30] *Id.* at *11.
[31] *Id.*
[32] *Id.* at *12-14.
[33] *Id.* at *16.
[34] *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co.*, 2022 WL 14437414, at *1 (Del. Super. Ct. Oct. 18, 2022).
[35] *Id.* at *7.
[36] *Id.* at *8.

11

- Spinco met the definition of an "Organization" during the merger because Spinco was a Verizon subsidiary prior to the merger;[37] and

- the settlement payment was not a disgorgement and therefore not a covered Loss because the Loss definition applied only to "matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed" and the courts have held that disgorgement settlements are insurable under Delaware law.[38]

The Insurers have appealed the Superior Court's decisions that the Trust Action qualifies as a Securities Claim under the Transaction Policy and the Verizon Policy. "We review the interpretation of an insurance contract *de novo*."[39]

## II.

The Insurers argue that the Superior Court erred when it found that the fraudulent transfer claims were "brought derivatively." According to the Insurers, the plain meaning of a Securities Claim refers to claims brought derivatively under securities and corporate law, not the bankruptcy law relied upon by the Superior Court. They contend that the fraudulent transfer claims are not claims involving securities or corporate law and are direct and not derivative claims because the relief goes to the Creditors, not to FairPoint or Spinco.

Verizon responds that the Litigation Trust's fraudulent transfer claims meet the Securities Claim definition because in some instances a fraudulent transfer claim

---

[37] *Id.* at *9.
[38] *Id.* at *10-11.
[39] *Idearc*, 222 A.3d at 572.

can be brought as a derivative claim outside of bankruptcy. And even if not, Verizon argues that fraudulent transfer claims are derivative under bankruptcy law if the claims arose before FairPoint's bankruptcy and the damages sought benefit the debtor's estate and are distributed to general creditors. It also argues that the Policies' bankruptcy provisions protect Verizon from any adverse effect bankruptcy might have on its claims.[40]

## III.

The question before us is whether the Trust Action was brought derivatively. We agree with the Insurers that the Litigation Trust's state law fraudulent transfer claims are direct, not derivative claims and therefore were not brought derivatively as required by the Policies.

Under federal and state law, there are direct actions and derivative actions. Our decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, is instructive on how to distinguish direct from derivative claims.[41] In *Tooley*, this Court adopted a two-part test: (a) who suffered the alleged harm (the corporation or the stockholders, individually); and (b) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?[42]

---

[40] The Insurers raised other coverage arguments regarding the Transaction Policy and arguments specific to the Verizon Policy. Because we conclude that the Trust Action did not raise derivative claims, we need not reach the Insurers' other arguments.

[41] 845 A.2d 1031 (Del. 2004).

[42] *Id.* at 1039. Other state courts have followed the *Tooley* test. *See, e.g.*, *Murphy v. Inman*, 983 N.W.2d 354, 370 (Mich. 2022) ("[W]e adopt the framework set forth by the Delaware Supreme

13

An equity holder injured directly can assert an individual action for injuries affecting its rights,[43] with the recovery flowing directly to the equity holder.[44] By contrast, an equity holder who satisfies certain procedural requirements can bring a suit derivatively on behalf of the entity for harm done to the business entity, with any recovery going to the entity.[45] Although derivative actions are typically brought by equity holders, creditors can step into the shoes of the equity holders and bring derivative claims when a business entity is insolvent.[46]

State fraudulent conveyance law allows creditors to avoid fraudulent transfers by a debtor.[47] Fraudulent transfer claims are direct, not derivative, because the creditors suffered the harm caused by the fraudulent transfer, and the remedy benefits the creditors, not the business entity.[48] Fraudulent conveyance law

---

Court in *Tooley*."); *Corwin v. British Am. Tobacco PLC*, 821 S.E.2d 729, 736 (N.C. 2018) ("[W]e agree with the relevant reasoning of the Delaware courts."); *Parametric Sound Corp. v. Eighth Jud. Dist. Ct.*, 401 P.3d 1100, 1108 (Nev. 2017) ("[W]e align our jurisprudence with Delaware's."); *Keller v. Est. of McRedmond*, 495 S.W.3d 852, 855 (Tenn. 2016) (adopting "the analytical framework enunciated by the Delaware Supreme Court"); *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 381 (N.Y. App. Div. 2012) ("[W]e adopt the test the Supreme Court of Delaware developed."); *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 425 (Md. 2009) (adopting *Tooley* factors).

[43] *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021).

[44] *See, e.g.*, *Citigroup, Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1138-40 (Del. 2016).

[45] *Brookfield Asset Mgmt., Inc.*, 261 A.3d at 1262.

[46] *N. Am. Catholic Educ. Programming Fdn., Inc. v. Gheewalla*, 30 A.2d 92, 101 (Del. 2007).

[47] *See* N.C. Gen. Stat. § 39-23.7(a).

[48] *Prod. Res. Grp., L.L.C., v. NCT Grp., Inc.*, 863 A.2d 772, 777 (Del. Ch. 2004) ("[T]he law of fraudulent conveyance exists to protect creditors.").

"enable[s] creditors to challenge actions by parent corporations siphoning assets from subsidiaries."[49]

The Litigation Trust alleged as much in its complaint. It alleged that the Litigation Trust brought the suit "to prosecute the causes of action of creditors."[50] According to the complaint, Verizon's transfers were fraudulent as to the Creditors and were made with the intent to hinder, delay, or defraud Creditors.[51] Also, the Litigation Trust did not comply with the procedural requirements to bring its fraudulent transfer claims as derivative claims. If the fraudulent transfer claims were derivative, the Litigation Trust would have complied with Federal Rule of Civil Procedure 23.1(a) when bringing suit and the requirements in Rule 23.1(c) before settling the litigation.[52] The Litigation Trust brought the Trust Action directly, not derivatively.

---

[49] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

[50] A350-51. The Superior Court held that "[t]he Court may disregard the underlying claimant's 'unilateral characterizations' of its claims." Transaction Policy Opinion, at *6 (quoting *Northrop Grumman Innovation Sys., Inc.* v. *Zurich Am. Ins. Co.*, 2021 WL 347015, at *11 (Del. Super. Ct. Feb. 2, 2021)). The Litigation Trust had no stake in the Verizon coverage dispute and no reason to mischaracterize its claims. In any event, as explained above, under settled precedent, fraudulent transfer claims are direct, not derivative.

[51] A352-53.

[52] *See, e.g.*, *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007) ("[A] plaintiff is obliged to plead, with particularity, facts that establish demand futility.").

15

A.

The Superior Court held that "[f]raudulent transfer claims . . . are not necessarily direct claims outside of bankruptcy" because "Delaware courts have held that creditors possess derivative standing to bring clawback actions on behalf of a corporation when that corporation is insolvent."[53]  It is correct that creditors have standing to pursue derivative claims when a business entity is insolvent.  But the cases the Superior Court relied on do not support its conclusion that fraudulent transfer claims can be asserted derivatively.  One of the cases the Superior Court relied on treated fraudulent transfer claims as direct claims, not derivative claims.[54]  And in both cases, the derivative claims were for breach of fiduciary duty against directors and officers – claims that are undisputedly derivative when brought on behalf of the business entity.[55]  A business entity's insolvency does not convert direct claims like fraudulent transfer claims into derivative claims.

---

[53] Transaction Policy Opinion, at *11 (citing *Quadrant Structured Prod. v. Vertin*, 102 A.3d 155, 551, 556 (Del. Ch. 2014).
[54] *Quadrant Structured Prod.*, 102 A.3d at 195-202 (examining fraudulent transfer claims as direct as opposed to derivative claims).
[55] *Gheewalla*, 30 A.2d at 101 (focusing on derivative breach of fiduciary duty claims and holding that "the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties"); *Quadrant Structured Prod.*, 102 A.3d at 171-72 (noteholders had standing to bring derivative breach of fiduciary duty claims upon insolvency of business entity).

16

B.

The Superior Court "put aside" the pre-bankruptcy nature of the Trust Action claims and held alternatively that the Securities Claim definition was broad enough to encompass claims that are direct outside of bankruptcy but treated as derivative upon a bankruptcy filing. As explained below, however, we disagree with the court that Section (2) of the Securities Claim definition includes not only federal securities law and state corporate law derivative claims, but claims considered derivative under bankruptcy law.

1.

We start our analysis with the *Idearc* decision and its definition of a Securities Claim. In 2006, Verizon spun off its print and electronic directories business to its stockholders through a new company, Idearc. The transaction saddled Idearc with over $7 billion in debt, which in hindsight turned out to be ill-timed considering the coming recession. Idearc filed for bankruptcy in 2009.[56] The bankruptcy trustee (not a litigation trust) brought fraudulent transfer claims and other state law claims against Verizon. After five years of litigation, Verizon prevailed but incurred over $48 million in defense costs.

---

[56] *Idearc*, 222 A.3d at 570.

With the Idearc spinoff, Verizon purchased primary and excess runoff policies that covered defense costs for a Securities Claim. The policies defined a "Securities Claim" as a Claim against any Insured Person:

(1) Alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

(a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an Organization; or

(b) brought by a security holder of an Organization with respect to such security holder's interest in securities of such Organization; or

(2) brought derivatively on behalf of an Organization with respect to such security holder of such Organization, relating to a Securities Claim as defined in subparagraph (1) above.[57]

Verizon sued its Insurers to recover its defense costs. The Superior Court found that state law fraudulent transfer and other common law claims were Securities Claims under the Policies and therefore defense costs were covered losses. On appeal, we started by "look[ing] at the definition of a Securities Claim as a whole and applying the plain and ordinary meaning of the words used by the parties."[58] Two things immediately stood out. First, "the words used in the definition mirror those in a specific area of the law recognized as securities regulation" and were "not

---

[57] *Id.* at 572-73.
[58] *Id.* at 573.

of general application to other areas of the law."[59]  And second, the use of the limiting words "regulating securities" referred to the regulations, rules, or statutes that regulate securities.

We noted that "[i]f a claim arises from a 'purchase or sale' of securities, or is brought by a securities holder with respect to such interest, the claim necessarily pertains to a law one must follow when engaging in a securities transaction."[60] Specific to the bankruptcy trustee's fraudulent transfer claims, we held that:

> "[The Texas Fraudulent Transfer Statute's] purpose is to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach."  The relevant provisions of [fraudulent transfer statute] set standards for fraudulent transfers and specify creditors' remedies.  The Bankruptcy Code provisions "outline the circumstances under which a trustee may pursue avoidance."  Neither of these statutes is specific to transfers involving securities.  Like the statutory unlawful dividend claims, these laws give rise to causes of action with or without the presence of securities.  Thus, these claims are not specific to securities regulation, and do not fall within the definition of a Securities Claim under the policy.[61]

The Verizon policies in the *Idearc* decision and their nearly identical definition of a Securities Claim are relevant to the Policies in this case.  Here, the Securities Claim definition once again refers to "a specific area of the law recognized as securities regulation" and is "not of general application to other areas of the law." The definition here also uses the limiting words "regulating securities," which refers

---

[59] *Id.*

[60] *Id.* at 579.

[61] *Id.* at 577.

to the regulations, rules, or statutes that regulate securities. Like the litigation brought by the bankruptcy trustee against Verizon in *Idearc*, the fraudulent transfer claims in the Trust Action did not raise a Securities Claim under Section (1) of the definition.

2.

At first, Verizon relied on Section (1) of the Securities Claim definition in this case.[62] After our *Idearc* appellate decision, however, Verizon resorted to Section (2). The Superior Court differentiated the coverage under Section (2) from Section (1) by relying heavily on the language difference between Section (2) of the *Idearc* policy and the Policies here. In *Idearc*, Section (2) of the Securities Claim definition specifically referred to Section (1) – "relating to a Securities Claim as defined in subparagraph (1) above." Section (2) of the Transaction and Verizon Policies does not. According to the Superior Court, the difference in language meant that Section (2) was no longer tethered exclusively to securities law-related claims.

The difference in Section (2)'s language between the two cases did not, however, transform the definition of a Securities Claim into a new definition that imports bankruptcy law. Neither Section (1) nor Section (2) refer to bankruptcy law. By isolating one section of the definition and ignoring the other, it is easy to lose

---

[62] A156-57 (Plaintiffs' Opposition to Defendants' Motion to Dismiss or Stay this Action).

20

sight of the bigger picture – both sections of the definition relate to a *Securities* Claim as understood by securities law and state corporate law.

In the securities regulation context, securities purchasers bring direct securities law claims against business entities under statutes, rules, and regulations like Rule 10b-5, Section 11, and Section 12(a)(2).[63] A plaintiff typically claims that false and misleading statements were made to induce the purchase or sale of securities. Section (1) of the Securities Claim definition covers these claims. But Section 14(a) securities law claims have also been brought on behalf of a business entity and have been characterized as derivative claims.[64] Section (2) covers these putative federal derivative claims.

Also, federal securities lawsuits are sometimes accompanied by follow-on state law derivative suits based on the same underlying allegations.[65] A plaintiff

---

[63] *Idearc*, 222 A.3d at 573-75; *see, e.g.*, 17 C.F.R. § 240.10b-5 (Rule 10b); 15 U.S.C. § 77(k) (Section 11); 15 U.S.C. § 77I (Section 12(a)(2)).

[64] *See, e.g., Lee v. Fisher*, 70 F.4th 1129, 1137 (9th Cir. 2023) (alleging in derivative suit a violation of 14(a)); *Emps. Ret. Sys. v. Jones*, 2022 WL 14160253, at *1 (S.D. Ohio Aug. 23, 2022) (approving settlement of Section 14(a) derivative claims against certain directors and officers); *In re Pinterest Deriv. Litig.*, 2022 WL 484961, at *2–5 (N.D. Cal. Feb. 16, 2022) (granting preliminary approval of a settlement of a Section 14(a) derivative claim); *Seafarers Pension Plan v. Bradway*, 23 F.4th 714, 717 (7th Cir. 2022) (alleging in a derivative suit Boeing Company's violation of 14(a)); *Pickett v. Teladoc Health, Inc.*, 2021 WL 4239176 (S.D.N.Y. Sept. 17, 2021) (granting motion to dismiss derivative Section 14(a) action against directors and officers); *In re Bank of Am. Corp. Sec., Deriv., & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 292 (S.D.N.Y. 2010) ("[S]hareholders may bring both direct and derivative claims under Section 14(a).").

[65] *See, e.g., Malone v. Brincat*, 722 A.2d 5, 12-13 (Del. 1998) (holding federal securities law claim does not preclude state derivative suit for breach of fiduciary duty from the same false communications to stockholders).

bringing state law derivative claims for breach of fiduciary duty may allege that the business entity has been injured by the false or misleading statements made by the defendants, or that the board of directors breached its fiduciary duty by failing its oversight responsibilities.[66]

As understood under securities and corporate law, Sections (1) and (2) of the Securities Claim definition operate together to provide insurance coverage for direct and derivative securities law claims and follow-on state law corporate derivative claims based on the same allegations. The Litigation Trust's direct state law fraudulent transfer claims do not fall within either definition of a Securities Claim.

3.

The Superior Court concluded that the Policies' bankruptcy provisions "disabled certain exclusions when an insured files for bankruptcy and totally prevents the Insurers from discriminating against coverage merely because an insured filed for bankruptcy."[67] In Verizon's words, the Policies provide "coverage in both bankruptcy and non-bankruptcy contexts."[68] Applying bankruptcy law, the Superior Court held that the direct state law fraudulent transfer claims became derivative within the bankruptcy proceeding.

---

[66] *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).
[67] Transaction Policy Opinion, at *12.
[68] Answering Br., at 28-29.

22

We agree with the court that the place to look for the effect of bankruptcy on the Securities Claim definition is the section addressing bankruptcy. But we disagree with its interpretation of that provision. In relevant part, Section 19, entitled "Bankruptcy," states that "[b]ankruptcy or insolvency . . . shall not relieve the Insurer of any of its obligations hereunder."[69] The bankruptcy provision protects contractual rights as they existed outside of bankruptcy from being altered by bankruptcy.[70] It does not, however, expand contractual rights or create new rights.

Section 19 does not change the meaning of "Securities Claim" by applying federal bankruptcy law and its definition of a derivative claim. The Superior Court recognized as much when it held that "the Securities Claim definition is not dependent on whether a Claim is brought inside or outside of bankruptcy."[71] The Insureds have not argued that FairPoint's bankruptcy filing relieved them of liability for Securities Claims as defined in the Policies. After FairPoint's bankruptcy, a Securities Claim was still defined by reference to securities and corporate law, not bankruptcy law.

---

[69] A1716 (Transaction Policy); A1793 (Verizon Policy).

[70] *See In re USA Gymnastics*, 624 B.R. 443, 455 (Bankr. S.D. Ind. 2021) (interpreting coverage provision providing that insured's bankruptcy will not relieve the insurers of their obligations to "simply mean[]" that policy provisions continue after bankruptcy); *Eichler v. Twin City Fire Ins., Co.*, 2014 WL 12572922, at *2 n.3 (C.D. Cal. Feb. 18, 2014) ("[Insurer] is not arguing that its obligations are relieved by [corporation's] bankruptcy. Rather, it argues—correctly—that its obligations have not yet been triggered under the terms of the Policy.").

[71] Transaction Policy Opinion, at *12.

## 4.

Finally, the Superior Court focused on a word difference between Section (2) and other Policy provisions. Section (2) uses the term "security holder" rather than the word "shareholder" found in other Policy provisions. According to the court, the word choice in Section (2) shows that it is not limited to shareholder derivative suits.[72] But the use of "security holder" rather than a "shareholder" simply recognizes that shareholders are not the only equity owners that can bring derivative securities and common lawsuits. Alternative business entity owners and creditors can bring derivative claims on behalf of the entity.[73] More significantly, the use of the word "security holder" ties Section (2) back to a "securities" claim definition in Section (1) and reinforces our view that Section (2), like Section (1), applies to "securities" claims in the securities law and corporate law context.[74] Section 19 still controls the effect of bankruptcy on coverage under the Policies.[75]

---

[72] *Id.* at *7.

[73] *Gheewalla*, 930 A.2d at 101; *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011) (LLC members); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) (limited partners).

[74] Answering Br., at 28.

[75] Verizon points out that an Organization is part of the Securities Claim definition, and an Organization includes a bankruptcy debtor-in-possession. Like Section 19 and its bankruptcy provision, including a debtor-in-possession in the definition of an Organization protects the insured from arguments that allows the insurer to avoid its coverage obligations from the bankruptcy.

24

IV.

The Policies defined a Securities Claim in the context of securities and corporate law, not bankruptcy law. If a bankruptcy occurred, the Policies provided that existing contractual rights would be protected but did not expand or create new coverage. The Litigation Trust's state law fraudulent transfer claims were direct, not derivative claims, and therefore were not covered under Section (2) of the Securities Claim definition. The judgment of the Superior Court is reversed.